**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AARON LETT**, <br><br> Plaintiff, <br><br> *v.* <br><br> **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY,** et al., <br><br> Defendants. | **CIVIL ACTION** <br><br><br> **NO. 19-3170-KSM** |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                              **NOVEMBER 26, 2021**

Plaintiff Aaron Lett brings disability discrimination claims against his former employer, Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Pennsylvania Human Relations Act ("PHRA"). Lett also claims that his former union, Defendant International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division, Local 1594 ("SMART" or the "Union"), aided and abetted SEPTA's discriminatory conduct in violation of the PHRA. Defendants have moved for summary judgment on all of Lett's claims. For the reasons discussed below, the motions are granted in part and denied in part.

## I.    *Factual Background*

SEPTA provides public transit services in the greater Philadelphia area, serving five Pennsylvania counties with connections in Delaware and New Jersey. (Doc. No. 58-2, Ex. 1 at ¶ 2.) In November 2015, SEPTA hired Lett as an operator at SEPTA's Victory Division and trained him on how to operate buses, trolleys, and the Norristown High Speed Line. (Doc. No. 56-1, Ex. A, Lett Dep. at 18:10–12; 38:12–19; 39:3–13.)

### A.      The Collective Bargaining Agreement Between SEPTA and SMART

Operators in the Victory Division, including Lett, are members of SMART, and their employment is governed by a Collective Bargaining Agreement ("CBA") between SEPTA and the Union.  (Lett Dep. at 42:16–19; *see also* Doc. No. 53-2, Ex. E, CBA.)

#### 1.      Seniority System

Among other things, the CBA establishes a seniority system for choosing work assignments, where operators pick routes, or "runs" in order of seniority three times a year — January, June, and September.  (Doc. No. 53-2 at pp. 485, 488.)  More senior operators are not allowed to pick runs for less senior employees.  (Doc. No. 53-2, Ex. C, Harris Dep. at 78:11–24 ("I can't pick the run and give it to somebody else.  That's frowned upon.").)  And although operators are allowed to exchange assignments on a daily basis, any exchange must be approved by SEPTA.  (Doc. No. 53-2 at p. 491.)  In February 2017, Lett was 321 out of 383 in terms of seniority.  (Doc. No. 52-3, Ex. A-1 at p. 9.)

Although the Union has authority to "control and adjust seniority" under the CBA (Doc. No. 53-2 at p. 486), there is no evidence that SMART has ever allowed a scheduling change that violated the seniority-based picking system (*see* Harris Dep. at 51:2–4 ("There has never been a time when anyone was placed, changed, or moved in seniority."); *see also* Doc. No. 53-2, Ex. D, Schirg Decl. at p. 478 ¶ 11 ("I am not aware of SEPTA or the Union ever making any exception to this seniority-based picking system.")).  However, if an operator is disabled and has five years of seniority, the Union will consider the employee for a clerical position if one is available. (Harris Dep. at 23:6–24:14 (explaining that Article 1, Section 8 of the CBA refers to "clerk positions, and disabled operators that meet the qualifications will be considered for those duties if one is available"); Lett Dep. at 88:4–11 (explaining that he "asked Mr. Harris for jobs that did

not require driving," and he said "no, because [Lett had] not been here for five years," and "still [did]n't have enough seniority"); *see also* Draft Hr'g Tr. at 18:3–8 ("Article 1 refers to clerical positions. . . . [S]eniority is a component of that as well . . . ."), 24:3–26:3 (describing clerical positions).)  According to Union President and General Chairman Waverly Harris, this procedure is based in part on Article 1, Section 8 of the CBA, which states that "disabled operators will be given consideration in assigning them to such duties, as they may be able to perform, along with other employees."  (Harris Dep. at 23:6–24:14; Doc. No. 53-2 at p. 483.)

### 2. Attendance Policy

The CBA also includes a points-based attendance policy.  (Doc. No. 53-2 at p. 504.) Under that policy, employees are given 120 days of sick leave.  (*Id.* at p. 484.)  Once an employee runs out of sick leave, or if he chooses not to use sick leave, he is given two points for every day he is out sick.  (*See id.* at p. 505.)  When he accumulates 15 points, he is interviewed and notified in writing that he is at risk of discipline.  (*Id.* at p. 507.)  And once the employee reaches 20 points, he is subject to progressive discipline:  (1) one-day administrative suspension, (2) five-day administrative suspension with a final warning, and (3) discharge.  (*Id.* at p. 506.) Each time progressive discipline is imposed, the employee's point total is reduced by 10 points, and he is not subject to the next rung of discipline until he once again accumulates 20 points. (*Id.* at p. 507.)

### B. Lett Requests an Accommodation

In March 2017, Lett was diagnosed with end-stage renal disease (Lett Dep. at 91:11–23), and as a result, he had to undergo two surgeries[1] (*id.* at 93:9–20) and attend dialysis for an

---

[1] Lett was approved to take leave under the Family Medical Leave Act ("FMLA") from March 13, 2017 to May 16, 2017 to have and recover from these surgeries.  (Doc. No. 58-7, Ex. J., Apr. 25, 2017 FMLA Designation Notice, at p. 8; *see also* Lett Dep. at 96:24–97:4; Doc. No. 58-2 at ¶ 33.)

indefinite period (*id.* at 94:4–7).  On April 8, 2017, after the second surgery, Lett began receiving

chronic dialysis treatments three times per week.  (Doc. No. 58-6, Ex. H, at p. 44.)  Each

treatment lasted four hours, followed by a recovery period.  (Lett Dep. at 120:21–121:2; 170:12–

17, 168:21–23 ("I needed time to recover, you know.  You just don't get up and you are back to

normal.  You have to have recovery time.").)  After initial treatments at other centers, Lett settled

on a DaVita center, receiving dialysis treatments Mondays, Wednesdays, and Fridays from 3:00

p.m. to 7:00 p.m., which was the latest shift available at the time.[2]  (*Id.* at 94:16–19, 108:14–

109:17, 138:16–139:10.)

However, the 3:00 p.m. to 7:00 p.m. dialysis shift interfered with Lett's work run, which

ran from 9:00 a.m. to 7:00 p.m. in May 2017.  (*Id.* at 216:10–19.)  So before returning to work,

Lett went to SEPTA's Equal Employment Opportunities ("EEO") Department to speak with

ADA coordinator, Jaqueline Hopkins, about a scheduling accommodation.[3]  (*Id.* at 100:9–101:1,

101:6–11; Doc. No. 53-2, Ex. B, Hopkins Dep., at 21:13–22:4.)  After "a little bit of a wait,"

Hopkins came out of her office, handed Lett an envelope with SEPTA's accommodation

paperwork, and asked why he needed an accommodation.  (Lett Dep. at 101:15–23.)  Lett

explained his situation and said he "need[ed] to adjust [his] schedule to receive [his] dialysis

treatments."  (*Id.* at 102:12–14.)  Hopkins responded, "well, your Union has a Contract and it is

governed by seniority.  There's not much we can do for you if anything at all.  I have a meeting

---

[2] DaVita offers four shifts for dialysis, beginning at 6:00 a.m., 11:00 a.m., 3:00 p.m., and 8:00 p.m.  (Doc. No. 56-1 at 145:17–20.)  When Lett first approached DaVita about being assigned to the 8:00 p.m. slot, he was told "there were no available chairs."  (*Id.* at 145:22–146:4.)

[3] During her deposition, Hopkins explained that SEPTA's EEO Department does not "actually make the accommodation."  (Hopkins Dep. at 25:8–9.)  Instead, "the power to give the accommodation is actually with the supervisors," and the EEO Department merely "help[s] foster the communication so the accommodation is made."  (*Id.* at 25:9–11.)  Specifically, Hopkins "centralize[s] that process," by taking the employee's request and medical information and "communicat[ing] with both the employee and their management to come up with an accommodation that works for everyone."  (*Id.* at 25:11–18.)

to go to[.]"  (*Id.* at 101:23–102:14.)  She then "waved her hand and walked away."  (*Id.* at 102:5–6.)  Lett describes the conversation as being "very short," and notes that he "didn't have th[e] opportunity" to request a specific accommodation from Hopkins or to give his "view point of what would be good for [him]."  (*Id.* at 102:1–10.)

Lett completed the accommodation request forms and returned them to Hopkins on May 10, 2017.  (*Id.* 103:14–104:5; Doc. No. 53-2, Ex. H, at pp. 522–24.)  In the forms, Lett explained that he had been diagnosed with end-stage renal disease and required dialysis three times per week.  (Doc. No. 53-2, Ex. H, at p. 522.)  Because this "treatment typically starts at 3:30 p.m. M W F," and his "current signup [was] 9–7 p.m.," Lett requested an "accommodation for flexibility in work schedule to allow treatment (3x per week[;] 4 hr a day)."  (*Id.* ("Request is for flexibility to allow for Dialysis treatments.").)  Lett also submitted a medical questionnaire, filled out by his doctor, which confirmed that Lett "needs dialysis 3x wk" and "need[s] flexibility with work schedule."  (*Id.* at p. 524; *see also id.* at p. 525 ("[D]ialysis is ongoing need unless there's a transplant . . . .  His work schedule must accommodate his dialysis (3x wk – 4 hrs @ time).").)

Hopkins testified that her usual process upon receiving a request like Lett's is "to contact the supervisors of [the individual requesting an accommodation] and also labor relations . . . to try to come up with some sort of solution."  (Hopkins Dep. at 41:12–22.)  However, she has no memory of speaking to Lett or his supervisors, and she knows she did not speak to anyone with the Union.  (*Id.* at 43:3–14.)

While his accommodation request was pending, Lett used intermittent FMLA leave and sick leave to attend his 3:00 p.m. treatments.  (Lett Dep. at 216:23–217:8; *see also* Doc. No. 58-7, Ex. I, Feb. 7, 2017 FMLA Designation Notice, at p. 2.)  And when he had not heard back from Hopkins and had not otherwise received help from SEPTA by May 22, 2017, Lett filed a charge

of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Lett Dep.

at 123:6–11, 128:10–17.)

Later that day, Lett received a written response to his accommodation request from

Hopkins.  (Doc. No. 53-2, Ex. J, May 22, 2017 Ltr. from Hopkins to Lett, at p. 531; Lett Dep. at

123:6–11 ("[A]fter I went to the EEOC I received this letter from Ms. Hopkins.").)  Hopkins's

letter summarized Lett's request, and then said:

> Unfortunately, as we discussed, your shift assignments are governed by a seniority
> system which SEPTA is not inclined to violate without the agreement of your
> collective bargaining unit.  If your union agrees to modify your work assignment
> (in violation of the seniority system) we would be happy to facilitate a flexible
> schedule as a reasonable accommodation. . . .  If you have any questions or further
> concerns, please contact me . . . .

(Doc. No. 53-2, Ex. J, at p. 531; *see also* Hopkins Dep. at 74:2–6 (confirming that if SMART

had allowed an exception to the seniority system, SEPTA would have provided Lett with a

different schedule).)[4]

After Hopkins sent the letter, she did not communicate with Lett again.  (Hopkins Dep. at

47:13–18, 52:11–13 ("[T]he letter constitutes my full response to Mr. Lett on his request."); *see

also id.* at 51:11–23 ("I'm not even going to lie and pretend like I thought about this case after I

sent the letter because that would not have been possible for me to even do.  Once I send a letter

---

[4] Hopkins's letter also included a note at the bottom, which said, "If you disagree with this
decision and would like to file an appeal, please provide written notification to me within ten (10)
calendar days."  (Doc. No. 53-2, Ex. J, at p. 531 n.1.)  During oral argument, counsel for SEPTA
repeatedly emphasized that Lett could have appealed SEPTA's decision if he was unhappy with it.  (*See*
Draft H'rg Tr. at 6:20–23 ("[S]he references there is an appeal procedure in the reasonable
accommodation policy . . . , so there were many options for him to come back."); 7:16 ("P.S. appeal
procedure."); 43:8–9 ("You can also file an appeal under our policy."); 44:22 ("File an appeal.").)  But
during her deposition, Hopkins testified that Lett would not have been able to file an appeal, because in
SEPTA's view, he had not been given a formal denial that would spark the appeals process:  "If, for
instance, an employee is unhappy with an accommodation that they received . . . they actually can file an
appeal with the ADA Committee.  But in this case, Mr. Lett was not denied an accommodation, so that
part would not have even come into play."  (Hopkins Dep. at 45:8–16; *see also id.* at 67:5–20.)

out and it's telling the person what they need to do, and then it also invites them to contact me

back if they have any questions, my assumption is that the employee is fine and that I will hear

from them if they've run into any troubles.").)  And based on Hopkins's letter, Lett believed that

he needed to follow up with the Union, not with SEPTA, so he did not reach out to her again.

(Lett Dep. at 125:14–24.)

Lett showed the letter to his Union representatives, Chairman Harris, Vice General

Chairman Curtis Filmore, and Representative Dave Stentman, who made a copy of the letter and

met with James Schirg, Director of Transportation for SEPTA's Victory Division.  (*Id.* at 124:2–

10, 161:5–162:2; Schirg Decl. at ¶ 1.)  Nothing ever came of this meeting:

> Q:  Did they talk to you after their meeting with Mr. Schirg?
>
> A:  They didn't say anything to me.  I would always — if I saw them, I would
> have to bring it up to them, but they would never come out to me and tell
> me where I stood or anything.  They wouldn't say anything to me.

(Lett Dep. at 124:5–125:11.)[5]

When Lett "couldn't get help from SEPTA or the Union, [he] asked" DaVita whether he

could move to the 8:00 p.m. dialysis shift.  (*Id.* at 114:24–115:8; 120:2–18, 131:22–132:4 ("So,

in order to hold on to my job and not wear myself out physically, I approached the dialysis center

for help on getting treatment in order for me to continue to work.").)  There was a chair available

for the later shift, so the center allowed Lett to change appointment times.  (*Id.* at 145:22–

---

[5] During oral argument, Plaintiff's counsel explained the difficulty Lett faced trying to meet with
his Union officials:

> [T]his is not a Union that has a Union office that is established where people can go and
> see the Union people. . . .  They don't have an office. . . .  The only time you can catch
> those people is if you are on the same shift or you wander in when they are not driving and
> you are not sure wh[en] that will be so it's not like Mr. Lett had opportunities to go to a
> specific office and have sit-down with the Union members.  He did the best he could.

(Draft H'rg Tr. at 29:19–30:5.)

146:11.)  At the June picking, Lett chose the bus morning run, which ended around 7:00 p.m., so he was able to maintain his 8:00 p.m. dialysis shift.  (*Id.* at 141:16–142:21; 218:4–9.)

Although the 8:00 p.m. shift worked with Lett's regularly scheduled run, it still interfered with Lett's schedule at times, like when he was "drafted" to work overtime.[6]  (*See id.* at 148:22–149:5 ("I was able to get the treatment from 8:00 to 12:00, but it did interfere with my SEPTA schedule, because if . . . the date I got [d]rafted, . . . I had to be at SEPTA at 2:00 a.m. in the morning, that would mean I would have to jump out of the dialysis chair and drive an hour to report to work without any recovery.").)  When the timing overlapped, Lett took intermittent FMLA leave to attend dialysis.  (*Id.* at 152:23–155:21 (identifying dates that Lett used intermittent FMLA leave); *see also* Schirg Decl. at ¶ 22 (identifying dates that Lett used intermittent FMLA leave).)

### C.  *Lett Is Assigned to the Bus List*

At the next picking in September 2017, Lett was driving when it was his turn to pick a run.  Because Lett was not able to pick a new run, he was assigned to the bus list.  (Lett Dep. 146:16–21, 147:10–14.)  Operators on the bus list do not have a set schedule.  Instead, their schedule changes day to day as they cover various assignments throughout the week.  (*Id.* at 146:18–147:5 ("The first part of the week you could work early mornings.  The middle part of the week you could be working midday, and the weekends you could be working either morning or night."), 147:23–148:1, 173:3–9 (describing this assignment as the "really hard one," because he had no set schedule, and his schedule was "all over the place").)

---

[6] Lett testified that although his run is only for five days a week, he actually worked six days a week, with the final day being "mandatory overtime."  (Lett Dep. at 105:9–106:1 ("On your first day off you would always . . . be drafted.  Basically, meaning you would have to work your first day off during the week."), 226:7–13 ("So, if you have a regular shift for five days, that sixth day you are on — You are, basically, on call and you have a report time [that] could be any time of the day, and sometimes they are at 2:00, 4:00 in the morning.  It just depends on when they need you there.").)

According to Lett, "this is where the conflict came because on the bus list [he] didn't have a steady schedule." (*Id.* at 219:18–21.) This made it impossible for Lett to pick a consistent, non-conflicting dialysis appointment time:

> [T]he next pick I was put on the list, and the list means I have to come in whenever, whenever I am scheduled, you know. You don't have a 9:00 to 7:00. You don't have anything in concrete. You are all over the place. The dialysis center doesn't work like that. I can't go from 8:00 [p].m. until 12:00 a.m. and then jump from — and then if my schedule at work says I gotta be at work at 12 o'clock in the afternoon, so I am not gonna go to the 8:00 p.m. shift. I am gonna go to the 6:00 a.m. shift. [The dialysis centers] don't work like that. They don't do that.

(*Id.* at 115:18–116:6; *see also id.* at 246:10–16.)

So, Lett again approached Union Chairman Harris to ask about his schedule. Specifically, Lett asked if he could report every day for the morning bus list shift. (*Id.* at 173:10–14; *see also id.* at 174:6–10 ("I asked him if I could be mornings on the bus shift instead of being switched from midday to afternoon, could I just report every morning at 4:30. No schedule[d] shift, just the time would be the same.").) Harris responded "no," telling Lett "seniority," meant he "couldn't do it." (*Id.* at 173:14.) Lett threw "out different ideas as to . . . what [he] would be able to work," but Harris "would always say, well, no, [you] can't do that because of seniority. Seniority, sorry. It is the law, seniority." (*Id.* at 293:1–4; *see also id.* at 293:13–14 (explaining that Curtis Fillmore also . . . pretty much said there is nothing he could do").)

Lett then spoke with Representative Stentman, who told him that the Union "had note of the issue and that they would be speaking or there would be a meeting with SEPTA to address this issue . . . but every time [Lett] would talk to [Stentman], he said there was no meeting yet, they haven't scheduled it." (*Id.* 293:5–13.) In the meantime, Lett kept his 8:00 p.m. dialysis appointment and used FMLA and sick leave to attend the appointment when it conflicted with

his bus list shift.  (*Id.* at 219:22–220:2.)

### D.      *Lett Stops Reporting to Work*

Before long, Lett started receiving absence points for going to treatment.  Believing that

his "Family Medical Leave had been exhausted," and that he would soon be fired for

accumulating 20 attendance points, Lett stopped reporting to work after October 2, 2017.[7]  (*Id.* at

126:11–127:2; *see also id.* at 127:17–18 ("I know [the points] were coming back to back because

I had no more [FMLA] coverage."), 230:5–7.)  Lett testified that he stopped appearing for his

shift because he "wasn't getting any help and [he] believed that all [of his] Family Medical

Leave time was exhausted."  (*Id.* at 230:10–13.)

At the time, Lett had approximately 85 days of sick leave remaining, which SEPTA

applied from October to January.  (Schirg Decl. at ¶ 26.)  On January 29, 2018, Schirg sent Lett a

letter, explaining that he had exhausted all sick leave and was being "dropped from the rolls

effective immediately."  (Doc. No. 53-2, Ex. K, at p. 533; *see also* Schirg Decl. at ¶ 29.)  On

February 1, after receiving Schirg's letter, Lett called Chairman Harris, and Harris explained that

per the CBA, Lett had 120 days to return to work — Harris referred to this as "mirror time" —

and maintain his seniority.  (Lett Dep. at 164:5–6; *see also* Harris Dep. at 63:18–64:6.)  Lett

responded that he did not know how he could just "come back to work" because he still needed

an accommodation.  (Lett Dep. at 164:9–23 ("I never received any recommendation for an

accommodation, so, basically, I would be right back in the same spot.").)  Lett then asked

---

[7] It is unclear whether Lett actually exhausted his FMLA leave before he stopped appearing for work on October 2.  (*Compare* Lett Dep. at 156:7–158:7 (discussing letter, which showed that Lett "still had two-and-a-half weeks of FMLA leave in October 2017"), *with id.* at 230:18–20, 231:8–10, 250:2–8, 250:21–251:1 (testifying that he received a letter which said his "family Medical Leave actually ended 9/29/2017" and that "according to the information [he] had, [he] didn't have any more Family Medical Leave time" and explaining that he never received a letter from SEPTA "that said [he] had 2.6 weeks left" of FMLA time), *and* Harris Dep. at 40:2–23 ("To my understanding, he exhausted all of his FMLA time.").)

whether he would continue to incur points if he left work to attend dialysis, and Harris responded "yes . . . [t]here is nothing [I] can do about that."[8]  (*Id.* at 164:9–23.)  Last, Lett asked Harris to file a grievance on his behalf, believing that he should have been given a scheduling accommodation per Article 1, Section 8 of the CBA.  (*Id.* at 294:24–295:5.)  But Harris disagreed with Lett's interpretation of that provision and responded, "[t]here is no grievance to file."  (*Id.* at 163:15–17.)

Lett did not return to work at SEPTA during the mirror period.  And since his call with Harris in February 2018, Lett has not spoken with anyone from SEPTA or SMART.

## II.   *Procedural History*

Lett filed this action against SEPTA and the Union on July 16, 2019.  (Doc. No. 1.)  Each Defendant filed a motion to dismiss Lett's amended complaint (Doc. Nos. 16 & 19), which the Court granted in part and denied in part on June 11, 2020 (*see* Doc. No. 11 (dismissing Count IV and Lett's request for punitive damages as against SEPTA and dismissing Counts I and IV as against SMART)).

In the remaining counts, Lett claims that SEPTA violated the ADA (Count I), the Rehabilitation Act (Count II), and the PHRA (Count III) when it failed to accommodate his disability and terminated him for having exhausted his sick leave.  (*See* Doc. No. 5 at ¶¶ 47, 50, 56; *see also* Doc. No. 11.)  As for the Union, Lett's only claim against SMART is that it violated the PHRA by aiding and abetting SEPTA's unlawful conduct.  (Doc. No. 5 at ¶ 56; *see also* Doc. No. 11.)

---

[8] Harris did, however, suggest that at the next picking, Lett choose a night schedule so that he could attend his dialysis in the morning.  (Lett Dep. at 165:17–166:22.)  But Lett testified that the morning dialysis shift was always full, and he didn't believe he would be able to switch appointment times again.  (*See* Lett Dep. 166:17–22 ("[T]he center was not gonna allow me to keep switching my schedule, you know, back and forth, that is why I was asking for help from him.").)

After discovery on these claims, SEPTA and SMART each filed a motion for summary judgment (Doc. Nos. 52 & 53), which Lett opposed (Doc. Nos. 58 & 59).  Each Defendant filed a reply brief (Doc. Nos. 61 & 62), and the Court heard oral argument on November 4, 2021.  On November 9, 2021, in response to the Court's questioning, Lett filed a supplemental letter brief (Doc. No. 71), and SMART filed a response letter brief two days later (Doc. No. 72).

## III.    *Legal Standard*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).  After the moving party

has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted).

## IV.    Discussion

Lett argues that SEPTA violated the ADA, the Rehabilitation Act, and the PHRA when it failed to offer him a reasonable accommodation, and that SMART aided and abetted SEPTA's unlawful conduct in violation of the PHRA. (*See* Doc. No. 5 at ¶¶ 47, 50, 56; *see also* Doc. No. 11.) Because an aiding and abetting claim cannot stand without an underlying violation, *see Williams v. Aramark Campus LLC*, Civil Action No. 18-5374, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020), we analyze whether Lett has stated a viable claim against SEPTA before turning to his claim against the Union.

### A.    Lett's Claims Against SEPTA

The ADA[9] prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)). "To establish a prima facie case of disability discrimination under the ADA," a plaintiff must demonstrate that: (1) "she is a disabled person within the meaning of the ADA"; (2) "she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "she has suffered an otherwise adverse employment decision as a result of discrimination." *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 591 (E.D. Pa. 2017). Here, there is no dispute that Lett has a qualifying disability (end-stage renal failure, requiring dialysis three

---

[9] Because the same legal standards apply to the ADA, the Rehabilitation Act, and the PHRA, the Court's analysis applies equally to Lett's claims under all three statutes. *See, e.g., Fromm v. MVM, Inc.*, 371 F. App'x 263, 269 n.3 (3d Cir. 2010) ("We have previously held that the ADA and the Rehabilitation Act apply the same standard to determine liability, and that the ADA and PHRA are interpreted coextensively." (internal citations omitted)).

times per week indefinitely) and that he was qualified to perform the essential functions of the job of operator.  As for the third prong, Lett claims that he suffered an adverse employment action when SEPTA failed to accommodate his disability, which forced him to stop appearing for work in October 2017 and resulted in his termination in January 2018.  (*See* Doc. No. 5 at ¶ 47 ("Defendants violated the ADA as evidenced by . . . their collective failure and refusal to allow Plaintiff to work a schedule that would permit him to receive required lifesaving treatment for his end-stage kidney disease, and thereafter terminating him . . . for having exhausted all sick leave."); *see also* Draft H'rg Tr. at 36:12–16 ("[T]he accommodation is the central theme . . . of his situation and all of these things [e.g., termination] fit within it.").)  SEPTA argues that Lett fails to satisfy this third element because it adequately engaged in the interactive process and Lett has failed to show that SEPTA's nondiscriminatory reason for terminating Lett was pretext for discrimination.

### 1.    *Failure to Accommodate*

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Taylor*, 184 F.3d at 306; *see also Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) ("[F]ailure to accommodate is a separately actionable 'unlawful employment practice' akin to wrongful termination or failure to hire."); *Sharbaugh v. W. Haven Manor, LP*, Civil Action No. 14-1723, 2016 WL 6834613, at *8 (W.D. Pa. Nov. 21, 2016) ("An employer's failure to reasonably accommodate the disabilities of an otherwise qualified employee constitutes an adverse employment action under the third element of the prima facie case of generic disability discrimination." (citing 42 U.S.C. § 12112)).

To make out a failure to accommodate claim, an employee must show:  "(1) the

employee had a disability; (2) the employer knew of the disability; (3) the employee can perform the essential functions of his job with a reasonable accommodation; and (4) the employer failed to provide an accommodation."[10]  *Sharbaugh*¸ 2016 WL 6834613, at *9.  In this case, Lett claims that SEPTA failed to accommodate him when it refused to engage in the interactive process.  *See Campo*, 2021 WL 4453613, at *18 ("Failure to engage in the interactive process is not an independent violation of the ADA; it is a way in which an employee can demonstrate that an employer breached its duty to provide reasonable accommodations.").

An employer fails to engage in the interactive process when:  (1) "the employer knew about the employee's disability;"  (2) "the employee requested accommodations or assistance for his or her disability;"  (3) "the employer did not make a good faith effort to assist the employee in seeking accommodations;" and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith."  *Taylor*, 184 F.3d at 319–20.  Again, there is no dispute that Lett has a qualifying disability, nor is there any dispute that SEPTA knew about that disability and that Lett requested an accommodation from SEPTA.  Instead, the parties dispute whether SEPTA acted in good faith and whether a reasonable accommodation existed.

### a.    *Good Faith*

Beginning with the question of good faith, we note that the interactive process "is aimed at determining what reasonable accommodations, if any, can address the employee's disability," and it "requires a great deal of communication between the employee and the employer."  *Reyer*,

---

[10] Because a failure to accommodate claim does not require that the "employer's action be motivated by a discriminatory animus directed at the disability . . . the *McDonnell Douglas* test does not apply."  *Reyer*, 243 F. Supp. 3d at 595 (quotation marks omitted); *see also Campo v. Mid-Atlantic Packaging Specialties, LLC*, Civil Action No. 20-1460-KSM, 2021 WL 4453613 (E.D. Pa. Sept. 29, 2021) ("Because failure to accommodate an employee's disability is itself evidence of discrimination under the ADA, there is no need in such a case for indirect proof of discrimination.  Thus, the *McDonnell Douglas* burden shifting framework does not apply." (cleaned up)).

243 F. Supp. 3d at 595 (quoting *Sharbaugh*, 2016 WL 6834613, at *9).  "Both parties bear responsibility for determining what accommodation is necessary," and "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Taylor*, 184 F.3d at 312 (quoting *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)); *see also Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) ("We agree that both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.").

A party can demonstrate "good faith in a number of ways, such as taking steps like the following:  meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome."  *Taylor*, 184 F.3d at 317.  By contrast, a party acts in bad faith when it "obstructs or delays the interactive process," otherwise fails to "help the other party determine what specific accommodations are necessary," or "fails to communicate by way of initiation or response."  *Id.* at 312 (quotation marks omitted); *see also Bultemeyer*, 100 F.3d at 1285 ("[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary.").

Viewing the evidence in the light most favorable to Lett, we find a genuine dispute as to whether SEPTA acted in good faith.  Once Lett requested an accommodation, SEPTA was required to engage in the interactive process.  *See Taylor*, 184 F.3d at 314 ("[T]he school district had more than enough information to put it on notice that Taylor might have a disability, and therefore, in order to trigger the school district's obligation to participate in the interactive

16

process, Taylor or her representative only needed to request an accommodation."); *Petti v. Ocean Cnty. Bd. of Health*, 831 F. App'x 59, 63 (3d Cir. 2020) ("Once an employee requests a reasonable accommodation, her employer must assist the employee in seeking accommodations . . . ." (cleaned up)); *Campo*, 2021 WL 4453613, at *19 ("Once the employer knows of the disability and the employee's desire for accommodations, the burden shifts to the employer to engage in the accommodation process." (quotation marks omitted)).

A jury could reasonably conclude that Hopkins's short interaction with Lett outside of her office and her follow up letter did not amount to "reasonable efforts" to assist Lett. There is no evidence that Hopkins spoke with Lett's managers to determine whether an accommodation was available, that she scheduled a follow up meeting to discuss Lett's accommodation request, or that she suggested alternative accommodations that may have been available to Lett given her knowledge that the Union was very unlikely to consent to an exception to the seniority system. *See Reyer*, 243 F. Supp. 3d at 596 (denying summary judgment on the employee's "failure to accommodate/interactive process claim" where the evidence showed that the employer's "representatives did not 'meaningfully' discuss the [employee's] lifting restriction either amongst themselves or with [the employee]"); *Campo*, 2021 WL 4453613, at *19 (finding the plaintiff "raised a genuine dispute of material fact as to whether [his employer] engaged in the interactive process" where the plaintiff's supervisor "admits that no alternative accommodations were presented to [the employee]," and there was no evidence that the supervisor directly asked the employee what accommodation he wanted); *Sharbaugh*, 2016 WL 6834613, at *18 (denying summary judgment because "[t]here is no factual dispute that Defendants engaged in no interaction with Sharbaugh between the time that Sharbaugh requested an accommodation and the time that they terminated his employment, and there is sufficient evidence in the summary

judgment record to allow a reasonable jury to find that Defendants acted in bad faith in failing to interact with Sharbaugh about his accommodation request"); *cf. Gardner v. SEPTA*, 410 F. Supp. 3d 723, 743 (E.D. Pa. 2019) (finding SEPTA made a good faith effort to engage in the interactive process where "[t]he record demonstrates that SEPTA considered Plaintiff's request, sought assistance or input from other resources," such as an independent medical examination, and "attempted to discuss alternatives" because the plaintiff's requested accommodation would have violated the applicable CBA); *Supinski v. Super Mkt. Serv. Corp.*, 3:CV-02-0271, 2005 WL 8168982, at *9 (M.D. Pa. Dec. 20, 2005) ("The evidence, however, does suggest that SMS engaged in good faith in the interactive process with Plaintiff:  Defendants explained the collective bargaining agreement to Plaintiff; suggested seeking volunteers to switch positions with her; and responded to correspondence from Plaintiff's lawyer.").[11]

SEPTA argues that, to the extent there was a breakdown in the interactive process, that breakdown was caused by Lett, not SEPTA.  We disagree.  A reasonable jury could find that Lett acted in good faith.  He timely notified SEPTA's ADA Coordinator of the need for an accommodation before returning to work.  He submitted the appropriate documentation, including an accommodation request form and medical records.  (Hopkins Dep. at 53:14–20.) And there is no evidence that Lett ever avoided communications from SEPTA or misrepresented his situation.  (*Id.* at 54:8–18.)  *Contra Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 333 (3d

---

[11] Indeed, it appears that Hopkins did not even live up to her own description of the interactive process:

> We're the ones who receive the information.  We're corresponding with the employee about their request.  We're receiving information from their doctor or representatives. We're conveying, to a degree, the information that's needed to the supervisors in order to help the conversation along.  So we are the ones who are actually driving the interactive process, and we're also documenting our efforts.

(Hopkins Dep. at 25:22–26:10.)

Cir. 2003) (attributing breakdown in interactive process to the employee where the employer granted her accommodation request on three prior occasions, the employee had notice that she would need to request additional accommodation if her temporary disability persisted, and "not only did she fail to communicate, she affirmatively misrepresented her situation, thus thwarting [her employer's] attempts to learn about her condition" (quotation marks omitted)); *Petti*, 831 F. App'x at 64 (finding that the interactive process ultimately broke down because the employee failed to respond to the employer's request for a meeting to discuss its proposed accommodations).

SEPTA emphasizes that Lett did not speak to Hopkins again after receiving her letter. (*See* Hopkins Dep. at 67:16–18, 67:21–23.)  But a jury could find that Lett failed to follow up with Hopkins because based on Hopkins's letter, he reasonably believed that his only option was to follow up with the Union about his request.  (*See* Lett Dep. at 125:12–20.)  Lett's persistence with Union officials, instead of Hopkins, is particularly reasonable given Representative Stentman's assurances that SMART officials and SEPTA management were aware of Lett's situation and had scheduled a meeting to discuss it.  (*See id.* at 293:5–13.)

On this evidence, a jury could find that SEPTA failed to act in good faith and that any breakdown in the interactive process is attributable to SEPTA.

### b.      *Available Accommodations*

### i.      *Scheduling Change*

Next, SEPTA argues that Lett's claim nonetheless fails because his requested accommodation — a change in his schedule — conflicted with the CBA's seniority rules and was, therefore, unreasonable as a matter of law.  (Doc. No. 53-1 at p. 9.)  *See Taylor*, 184 F.3d at 319–20 (explaining that the final element of a failure to accommodate claim is that "the

employee could have been reasonably accommodated but for the employer's lack of good faith").

"[T]o show that a requested accommodation conflicts with the rules of a seniority system is ordinarily to show that the accommodation is not 'reasonable.'" *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 394 (2002) ("[S]uch a showing will entitle an employer/defendant to summary judgment on the question — unless there is more."); *see also Kralik v. Durbin*, 130 F.3d 76, 83 (3d Cir. 1997) ("[A]n accommodation to one employee which violates the seniority rights of other employees in a collective bargaining agreement simply is not reasonable.").

That said, an employee "remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts." *U.S. Airways, Inc.*, 535 U.S. at 405. For example, the employee can show "that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed — to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *Id.* The employee can also "show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter." *Id.*

SEPTA argues that there are no special circumstances that would render Lett's requested scheduling accommodation reasonable because SMART has never allowed it to grant an accommodation that violated the seniority-based scheduling system. (Doc. No. 53-1 at p. 13.) Lett responds that regardless of whether a similar exception was granted in the past,[12] special

---

[12] During oral argument, Plaintiff's counsel argued that a similar exception has been granted in the past, referencing Hopkins's testimony about a different employee who was a member of a different union. (Draft H'rg Tr. at 32:3–11.) But evidence that a different union allowed an exception to its

circumstances exist because Article 1, Section 8 of the CBA states that "disabled operators will be given consideration in assigning them to such duties as they may be able to perform." (Doc. No. 58-1 at pp. 22–23.) SEPTA disagrees with Lett's reliance on this provision, but argues that, in any event, this Court cannot look to or interpret the reach of Section 8, because interpretation of the provisions in a CBA is reserved for arbitration. (Doc. No. 62 at p. 4; *see also* Draft H'rg Tr. at 17:17–25 (SMART's counsel explaining that "if there is a dispute as to the meaning of a provision in the contract, I would say it would have to be arbitrated").)

We need not determine the meaning of Section 8 at this time. It is enough that the Union has never granted an exception to the seniority system, under Section 8 or otherwise, such that employees expect the seniority system to be strictly followed. *See U.S. Airways, Inc.*, 535 U.S. at 405 (explaining that special circumstances may exist if "the employer, having retained the right to change the seniority system unilaterally, *exercises that right fairly frequently*, reducing employee expectations that the system will be followed" (emphasis added)); *Supinski*, 2005 WL 8168982, at *8 ("It is only when an employee can show that a defendant does not treat employees uniformly because of *frequent* individual exceptions that a further exception may be reasonable." (emphasis added)). Indeed, as SMART's counsel explained at oral argument, even under the clerical program for disabled operators, the Union continues to follow rules of seniority. (*See* Draft Hr'g Tr. at 18:3–8 ("Article 1 refers to clerical positions. . . . . [S]eniority is a component of that as well . . . ."), 24:3–26:3; *see also* Lett Dep. at 88:4–11 (explaining that he "asked Mr. Harris for jobs that did not require driving," and Harris said "no, because [Lett had] not been here for five years," and "still [did]n't have enough seniority").) Because Lett has put forth no evidence that an exception to seniority has ever been granted, he cannot demonstrate

---

seniority system cannot support a finding that SMART has allowed exceptions in the past.

special circumstances, and we find that Lett's request for a scheduling accommodation that violated the CBA's seniority system was unreasonable as a matter of law.[13]

### ii.    *Other Available Accommodations*

That, however, does not end the inquiry because an employee is not required to show that he requested a reasonable accommodation.  *See Armstrong v. Burdette Tomlin Memorial Hosp.*, 438 F.3d 240, 246–48 (3d Cir. 2006) (reversing and remanding because the district court erroneously instructed the jury that the employee "had the burden of identifying and requesting from the [employer] a specific reasonable accommodation when, in fact, he only had to show he requested an accommodation in order to satisfy the second prong of his failure to accommodate claim"); *Brown v. Dunbar Armored, Inc.*, Civil No. 08–3286 (JBS/AMD), 2009 WL 4895237, at *3 (D.N.J. Dec. 10, 2009) ("Thus, any request for accommodation that makes it clear to the employer that [the] employee seeks accommodation generally, even if the specific accommodation requested is unreasonable, is sufficient to trigger the process.").  Instead, Lett must show that he requested some type of accommodation, thus triggering the interactive process, and that a reasonable accommodation existed.  *See Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) ("[T]he plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible."); *cf. Taylor*, 184 F.3d at 317–18 ("Put differently, because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with

---

[13] For this reason, SEPTA is entitled to summary judgment to the extent Lett asserts a stand-alone claim for failure to accommodate on the basis that SEPTA refused to give him a different run.

accommodations.  In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.").

The Third Circuit's discussion in *Taylor* is instructive.  In that case, the defendant school district argued that it was entitled to summary judgment on the employee's failure to accommodate claim because "the only accommodation [the employee] specifically requested was transfer to another position, which [the employee] later conceded was not feasible."  *Taylor*, 184 F.3d at 315.  The court disagreed.  It explained, "The ADA's regulations make clear that the purpose of the interactive process is to determine the appropriate accommodations."  *Id.* at 316.  "Therefore, it would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process."  *Id.*; *see also id.* ("[T]he employer likewise will often hold more information than the employee about what adjustments are feasible in the employee's current position.").  "In short, an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation."  *Id.* at 317.

Here, Lett identifies multiple potential accommodations, in addition to his request for a schedule change.  In particular, he notes that SEPTA could have provided him with an exception to the attendance policy so that he was not acquiring attendance points when his work schedule conflicted with his dialysis schedule.[14]  (Doc. No. 58-1 at p. 19; Draft H'rg Tr. at 34:9–16.)

---

[14] SEPTA argues that Lett never requested an exception to the attendance policy.  (*See* Draft H'rg Tr. at 12:24–25 ("He could have asked about the attendance points.").)  But as we explained above, Lett *was not* required to request every possible accommodation.  He was required only to make it known that he needed some form of accommodation and then working together, Lett and SEPTA were to identify an appropriate, reasonable accommodation.  We also note that had SEPTA engaged in the interactive process, it likely could have cleared up Lett's confusion surrounding his remaining FMLA leave, his

Likewise, the record suggests that he could have used his remaining sick leave to attend dialysis or SEPTA could have allowed him to take unpaid leave until the next picking, at which time Lett's seniority may have allowed him to choose a schedule that better accommodated his dialysis treatments without violating another employee's seniority rights.  (*See* Draft H'rg Tr. at 8:3–5 (SEPTA's counsel conceding that if the Union denied his request for a schedule change, "there certainly would have been other options, Your Honor.  He had 120 days of sick leave to use").)  SEPTA does not argue that these accommodations are unreasonable or overly burdensome, and indeed, Hopkins testified that SEPTA has granted similar accommodations in the past.  She estimates that bus operators account for more than 100 of SEPTA's annual ADA accommodations, and that these accommodations often include requests for unpaid leave. (Hopkins Dep. at 32:15–23, 33:2–9.)  Hopkins also testified that SEPTA frequently allows exceptions to the attendance policy.[15]  (*Id.* at 78:5–11.)

By failing to engage in the interactive process in good faith, SEPTA assumed the risk that these reasonable accommodations existed.  *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 194 (3d Cir. 2009) ("[A]n employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA[.]" (quoting *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 149 (3d Cir. 1998) (en banc))); *Donahue*, 224 F.3d at 235 ("[W]here a universe of potential accommodations has been identified, if the employer refuses in bad faith to engage in

---

outstanding sick leave, and the points-based attendance policy.

[15] SEPTA argues that it accommodated Lett by allowing him to take leave when his dialysis interfered with his work schedule.  (Doc. No. 53-1 at pp. 16–18.)  But Lett testified that in September 2017, he could no longer rely on FMLA leave and began receiving attendance points when he left work to receive his dialysis treatments.  In light of this testimony, we find an open factual dispute about whether SEPTA consistently allowed him to use leave to attend dialysis.

the interactive process, 'we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect.'" (quoting *Taylor*, 184 F.3d at 318)).

For those reasons, we deny SEPTA's motion for summary judgment to the extent it seeks dismissal of Lett's claim that SEPTA failed to accommodate him when it refused to engage in the interactive process.

### 2.  *Wrongful Termination/Constructive Discharge*

Lett also claims that he suffered an adverse employment action when he was forced to stop appearing for work in October 2017, and ultimately terminated in January 2018.  (*See* Doc. No. 5 at ¶ 47 ("Defendants violated the ADA as evidenced by . . . their collective failure and refusal to allow Plaintiff to work a schedule that would permit him to receive required lifesaving treatment for his end-stage kidney disease, and thereafter terminating him . . . for having exhausted all sick leave.").)  SEPTA analyzes this as a standalone claim for wrongful termination.  (Doc. No. 53-1 at pp. 18–20.)  But during oral argument, Plaintiff's counsel explained that Lett is not asserting a separate claim for wrongful termination, and instead, argues that his termination claim is part of the failure to accommodate claim:  "The wrongful termination comes because they didn't accommodate him and they gave him no other choice but to leave, especially in light of that letter that said your FMLA is gone after the 29th, and he adhered to that and did not come to work because he thought he was terminated at that point."  (Draft H'rg Tr. at 36:16–22; *see also* Draft H'rg Tr. at 36:12–16 ("[T]he accommodation is the central theme . . . of his situation and all of these things [e.g., termination] fit within it."); Doc. No. 58-1 at pp. 24–27.)  Given this argument, we find Lett's termination claim is better analyzed

as one for "constructive discharge," not "wrongful termination."[16]

Unlike a failure to accommodate claim, the *McDonnell Douglas* framework applies in the constructive discharge context.  Under that framework, "a plaintiff must first establish a prima facie claim of discrimination."  *Mercer*, 26 F. Supp. 3d at 445.  "If the plaintiff succeeds in making out a prima facie case, . . . the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action."  *Id.* (quotation marks omitted).  If the defendant can proffer a legitimate reason, the "presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination."  *Id.*

Courts in this Circuit have held that an employer's failure to accommodate can give rise to an inference of constructive discharge.  *See Pagonakis v. Express, LLC*, 315 F. App'x 425, 430 n.4 (3d Cir. 2009) ("We agree with the District Court that the alleged hostile work environment which she asserts forced her to resign was not sufficiently severe or pervasive to constitute an adverse employment action.  However, for the reasons discussed herein, her ADA

---

[16] SEPTA argues that Lett failed to exhaust administrative remedies as to his termination because he filed his EEOC charge "five months *before* he voluntarily stopped reporting to work," the charge "did not contemplate his termination," and Lett "failed to amend his EEOC Charge to include allegations of unlawful discipline or constructive discharge."  (Doc. No. 53-1 at pp. 15–16, 20.)  We disagree.  Lett's EEOC charge asserts a claim for failure to accommodate; he describes the discrimination as "continuing"; and the EEOC investigation was pending in October 2017, when he claims he was forced to stop reporting for work.  Given these facts, we find Lett's termination claim, which is based on SEPTA's alleged failure to accommodate, would reasonably be expected to grow out of an investigation into his EEOC charge and has, therefore, been exhausted.  *See Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996) ("Requiring a new EEOC filing for each and every discriminatory act would not serve the purposes of the statutory scheme where the later discriminatory acts fell squarely within the scope of the earlier EEOC complaint or investigation."); *Waiters v. Parsons*, 729 F.2d 233, 238 (3d Cir. 1984) ("While it is true that the allegedly discriminatory officials and acts are different, the core grievance — retaliation — is the same and, at all events, it is clear that the allegations of the appellant's complaint fall within the scope of the district director's investigation of the charges contained in the 1979 formal complaint."); *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) ("Once a charge of some sort is filed with the EEOC, this court has held that the scope of a resulting private civil action in the district court is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (quotation marks omitted)).

discrimination claim may nonetheless proceed on her failure to accommodate theory.  To the extent [the plaintiff] asserts that [the defendant's] alleged failure to accommodate, rather than a hostile work environment, resulted in her constructive discharge, she may present that theory to a jury."); *Rabuffo v. VCA Smoketown Animal Hosp.*, No. 5:15-cv-06378, 2016 WL 3165606, at *6 (E.D. Pa. June 26, 2016) ("Courts have observed that allegations of a failure to accommodate may provide support for a constructive discharge claim in some circumstances . . . ."); *Busch v. Oswayo Valley Sch. Dist.*, Civil Action No. 1:15-cv-239, 2016 WL 5394085, at *8 (W.D. Pa. Sept. 27, 2016) ("In the context of disability discrimination, several courts have noted that a failure to accommodate or to engage in the interactive process may support an inference of constructive discharge.") (collecting cases).

Consistent with those cases, on this record, a jury could find that Lett stopped reporting for work in October 2017 because SEPTA refused to engage in the interactive process, and he was forced to choose between reporting for his shifts on the bus list and attending dialysis — with the understanding that if he chose dialysis, he would continue to accumulate attendance points and ultimately be fired in any event.

SEPTA argues that even if Lett has made out a prima facie case of discrimination, his termination claim still fails because Lett has not rebutted SEPTA's legitimate nondiscriminatory reason for firing him in January 2018 — excessive absenteeism — or otherwise shown that his termination is the result of discriminatory animus.  (Doc. No. 53-1 at pp. 18–19.)  *Mercer*, 26 F. Supp. 3d at 445 ("If the plaintiff succeeds in making out a prima facie case, . . . the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action."  If the defendant can proffer a legitimate reason, the "presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the

evidence that the defendant's explanation is actually a pretext for discrimination.").  In response,

Lett argues that his termination claim survives because the "absenteeism on which SEPTA relies

arose solely from its discriminatory action in denying the Plaintiff a reasonable accommodation

for his injuries, i.e., he was not able to be actively employed because of the failure to

accommodate."  (Doc. No. 58-1 at p. 25.)

  As discussed above, we find that material issues of fact exist regarding whether SEPTA

failed to participate in the interactive process and, as a result, whether Lett suffered a

constructive discharge in October 2017, as opposed to being terminated in January 2018.  A jury

could reasonably believe that SEPTA knew its failure to accommodate Lett's disability left him

with no choice but to miss work for his dialysis treatment and thus, find that SEPTA's firing of

Lett for absenteeism in January 2018 was mere pretext for discrimination.  *See Schmidt v.*

*Pittsburgh*, CA No. 05-1446, 2007 WL 2683826, at *3 (W.D. Pa. Sept. 7, 2007) ("As discussed

above, material issues of fact exist regarding whether Plaintiff failed to participate in the

interactive process to determine an appropriate reasonable accommodation and, consequently,

whether Plaintiff suffered a constructive discharge.  Additionally, Plaintiff presents sufficient

evidence that Defendant has proffered inconsistent reasons for not relocating Plaintiff from the

Kenna Lab from which a jury could reasonably disbelieve Defendant's reasons.").

  We will allow Lett to present this theory to the jury. *See Pagonakis*, 315 F. App'x at 430

n.4 (finding that the plaintiff could submit her constructive discharge claim to the jury where she

alleged that the company repeatedly failed to accommodate her disability, to the point that she

felt compelled to take FMLA leave and eventually resign); *Rabuffo*, 2016 WL 3165606, at *6

("Here, Rabuffo alleges that VCA constructively discharged her when, following her surgery, it

refused to accommodate her disability and return her to employment, despite her repeated

requests.  This is sufficient to state a claim for constructive discharge.").

### B.    *Lett's PHRA Claim Against SMART*

In addition to prohibiting employment discrimination, the PHRA also makes it an "unlawful discriminatory practice" for any "labor organization . . . to aid [or] abet . . . the doing of any act declared by this section to be an unlawful discriminatory practice . . . ."  43 Pa. Stat. & Cons. Stat. § 955(e).  "[A] defendant may be liable under § 955(e) either as a result of [its] own discriminatory conduct, or for refusing to take prompt and remedial action against any discrimination suffered by an employee."  *Hollinghead v. City of York*, 912 F. Supp. 2d 209, 223 (M.D. Pa. 2012) (quotation marks omitted)); *see also id.* ("Under this aiding and abetting provision of the statute," a plaintiff may advance claims against individuals "who bear responsibility for implementing an allegedly unlawful discriminatory practice." (cleaned up)).

To be liable for aiding and abetting, there must be an underlying, primary violation by the employer.  *See McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa. 2019) ("Even if an individual employee is a supervisor for purposes of aiding and abetting liability under the PHRA, the Plaintiff must show a primary violation by the employer." (quotation marks omitted)); *Williams*, 2020 WL 1182564, at *10 ("For liability to be imposed on an aiding and abetting theory, however, there must be a cognizable predicate offense, *i.e.* a violation by the employer of the PHRA's or PFPO's primary anti-discrimination provision." (cleaned up)).

As discussed above, Lett has put forth evidence that SEPTA failed to accommodate him when it refused to engage in the interactive process.  We find that a jury, construing the evidence and drawing all inferences in the light most favorable to Lett, could also find that the Union aided and abetted SEPTA's failure to accommodate.

The Union argues that other than the seniority system, it had no authority to offer an

accommodation and therefore, cannot have aided and abetted SEPTA.  (*See* Draft H'rg Tr. at 22:1–10 (describing the issue as being "what can the Union control and what can the Union not control").)  But the evidence shows that although Union officials may not have had a role to play in the interactive process or the accommodation request once it denied the exception to seniority, Union officials continued to tell Lett that they were working with SEPTA.  Specifically, Representative Stentman told Lett that the Union "had note of the issue and that they would be speaking or there would be a meeting with SEPTA to address this issue . . . but every time [Lett] would talk to [Stentman], he said there was no meeting yet, they haven't scheduled it."  (Lett Dep. at 293:5–13.)  By choosing to insert itself into the interactive process, even though it had no apparent intention or ability to aid that process, the Union had sufficiently culpable intent to aid and abet SEPTA's refusal to engage in the interactive process.  *See Pinder v. Ortiz*, Civil Action No. 14–cv–2989, 2015 WL 317043, at *2 (E.D. Pa. Jan. 26, 2015) ("Requiring proof of intent to aid the employer under section 955(e) is consistent with the principles of aiding and abetting liability found in other areas of Pennsylvania law." (quoting *Destefano v. Henry Michell Co.*, No. 99–CV–5501, 2000 WL 433993, at *2 (E.D. Pa. Apr. 13, 2000))).  In other words, Union officials cannot repeatedly tell Lett that they are working with SEPTA to find a reasonable accommodation, fail to do so, and then avoid aiding and abetting liability by pointing to SEPTA.

## IV.   *Conclusion*

Summary judgment is granted in part and denied in part.  Summary judgment is granted to SEPTA and the Union to the extent Lett asserts a failure to accommodate claim based on their refusal to grant an exception to the seniority-backed scheduling system.  Otherwise, the motions are denied.

An appropriate Order follows.