## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AARON LETT**, <br><br> Plaintiff, <br><br> *v.* <br><br> **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY,** et al., <br><br> Defendants. | **CIVIL ACTION** <br><br> **NO. 19-3170-KSM** |

### MEMORANDUM

**MARSTON, J.**                                                **September 27, 2022**

Plaintiff Aaron Lett claims his former union, Defendant International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division, Local 1594 ("SMART" or the "Union") aided and abetted the discriminatory conduct of his former employer, the Southeastern Pennsylvania Transportation Authority ("SEPTA"),[1] in violation of the Pennsylvania Human Relations Act ("PHRA"). The case was tried to the Court, without a jury, on March 1 and March 2, 2022 (*see* Doc. No. 117 (March 1 Trial Transcript); Doc. No. 118 (March 2 Trial Transcript)), and the Court heard closing arguments on March 3 (Doc. No. 119 (March 3 Trial Transcript)). After reviewing the parties' Proposed Findings and Conclusions (Doc. Nos. 124, 125), the trial transcripts (Doc. Nos. 117–19), and the evidence admitted at trial,[2] the Court makes the following Findings of Fact and Conclusions of Law. *See* Fed. R. Civ.

---

[1] SEPTA was dismissed as a Defendant before trial pursuant to Local Rule 41.1(b).

[2] The parties submitted a set of Joint Exhibits before trial, and on March 4, 2022, Lett submitted a letter to the Court, moving the following Joint Exhibits into evidence: 1–8, 10–17, 21, 23, 25, 27, 31, 32, 34, 35, 37–41, 47, 48, 52, 65, 71, and 72. These exhibits are admitted, and the Court considers them in deciding its findings of fact and conclusions of law.

P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must

find the facts specially and state its conclusions of law separately.").

## FINDINGS OF FACT

### I.  *Lett's Employment at SEPTA.*

1.  Lett is a 54-year-old married man with seven children, three of whom live at home with him and his wife, Denean Lett.  (Doc. No. 117 at 18:14–16, 130:7–9.)

2.  Lett was hired by SEPTA on November 5, 2015 to work as an operator in SEPTA's Victory Depot.  (*Id.* at 19:1–7.)

3.  As an operator, Lett was trained to operate buses, trolleys, and the Norristown High Speed Line.  (*Id.* at 19:24–20:3.)

4.  After training, Lett chose to work as a bus operator.  (*Id.* at 21:4–5.)

5.  As an operator, Lett was responsible for driving the bus in a safe, efficient, and timely manner, and he was expected to complete pre-trip slips, inspect the bus and equipment, maintain the bus schedule, provide emergency services, notify the control center of conditions affecting services, collect and record all fares, provide courteous service to passengers, prepare reports on accidents, and observe all operating and safety rules.  (Doc. No. 117 at 22:7–23:5; Ex. 4 (SEPTA's job description for bus operators).)

6.  Lett generally worked six days a week, for a total of sixty hours per week.  (Doc. No. 117 at 19:17–18, 23:24–24:6.)

7.  Although he was supposed to have two days off each week, he was considered on call his first day off and was required to report to work to cover runs for other operators.  (*Id.* at 24:1–6.)

8.  James Schirg was the Director of Transportation at SEPTA's Victory Depot and Lett's immediate supervisor.  (*Id.* at 52:19–20, 155:4–5; Doc. No. 118 at 95:14–23.)

## II.       SMART and SEPTA

9.       The bus operator position is a Union job, and Lett became a dues-paying member of SMART when he began his employment at SEPTA.  (Doc. No. 117 at 19:19–21, 20:11–14, 78:6–18; *see also* Ex. 1 at Art. 1 § 1 (the Collective Bargaining Agreement (the "CBA")) (identifying SMART as "the sole and exclusive bargaining agent of all bus operators, trolley operators and conductors in [SEPTA's] employ").[3])

### A.       SMART's Function and Organization

10.      The Union acts as the collective bargaining representative for all operators working in SEPTA's Victory Depot.  (*See generally* Ex. 1.)

11.      Waverly Harris has been General Chairman of SMART since 2008.  (Doc. No. 118 at 25:20–25.)

12.      As General Chairman, Harris holds the highest ranking officer position within Local 1594, and in that role, he handles grievances, addresses safety issues, and upholds and negotiates the CBA between SEPTA and SMART.  (Doc. No. 117 at 134:23–135:2; Doc. No. 118 at 26:5–10.)

13.      In addition to being General Chairman, Harris has been employed by SEPTA for 28 years as a rail, train, and trolley operator.  (Doc. No. 117 at 134:6–9.)

14.      Harris also served as a Union representative in 2001 and as President of Local 1594 from 2015 through 2018.  (*Id.* at 134:10–13, 135:15–21, 136:5–10.)

15.      There are two other relevant Union officials.  Curtis Fulmore is Vice General Chairman of Local 1594 (*id.* at 39:18–21), and David Stinsman was a Union representative and local chairman at the time (Doc. No. 118 at 99:14–17).

---

[3] No portion of this Memorandum should be interpreted as assigning a definitive meaning to any provision of the CBA.

B.     **The Collective Bargaining Agreement.**

16.     As a bus operator and Union member, Lett's employment was governed by the CBA between SEPTA and SMART.  (Doc. No. 117 at 20:4–6; *see also* Ex. 1.)

*i.*     *The Seniority System*

17.     Among other things, the CBA establishes a seniority system for choosing assignments, under which operators pick routes (called "runs") in order of their seniority each January, June, and September.  (Doc. No. 117 at 24:7–11, 142:1–143:10; Ex. 1 at Art. 10 §§ 3–4.)

18.     In February 2017, Lett's seniority was 321 out of 383 operators in the Victory Depot.  (*See* Ex. 6 (the seniority roster as of Feb. 27, 2017); *see also* Doc. No. 117 at 24:10–12.)

19.     The picking process is overseen by a committee consisting of Schirg and two Union members.  (Doc. No. 118 at 40:21–41:6.)

20.     Harris typically sits as one of the Union members on the committee.  (*Id.* at 41:1–6.)

21.     Bus operators are given a date and time for their pick (Doc. No. 117 at 147:1–5), and picks are made in person over the course of a week, with approximately 45 people picking per day (Doc. No. 118 at 39:5–21).

22.     Available runs are posted online and updated daily, so the operators know which routes are available.  (Doc. No. 118 at 39:22–40:4.)

23.     If an employee is not able to attend a picking, he can pre-select his choices using a "pick slip."  (Doc. No. 117 at 24:15–25:1, 147:12–24; Doc. No. 118 at 40:5–20.)

24.     If the choices on the operator's pick slip are not available, the Union members on the committee pick for the absent employee.  (Doc. No. 117 at 24:22–25:4, 151:14–19; Doc. No. 118 at 41:20–42:13.)

4

25.     The Union has a long-standing, unwritten practice of assigning an employee to the position that he or she held a year before the picking if the employee's selections are unavailable.  (Doc. No. 117 at 151:14–19, 153:1–15; Doc. No. 118 at 41:20–25, 42:14–20, 44:11–16.)

26.     That said, the Union officials do not always follow this practice and will sometimes call the absent member to ask for his or her preferred pick if none of their preferred picks are available.  (Doc. No. 117 at 150:12–18.)

### ii.     The Attendance Policy

27.     The CBA also outlines a points-based attendance policy.  (Ex. 1 at Art. 38.)

28.     Under that policy, an employee is assigned two points for every day he or she is out sick.  (Doc. No. 117 at 25:16–19, 162:5–18; Ex. 1 at Art. 38 § 2.)

29.     If the employee's sick days fit a pattern (e.g., three call outs on the same day of the week within a 12-month period), then an additional two points are assigned for each turn-in.[4] (Ex. 1 at Art. 3 § 2.)

30.     Once an employee reaches 20 points, he or she is subjected to progressive discipline as follows:  (1) one-day administrative suspension, (2) five-day administrative suspension with a final warning, and (3) discharge.  (*Id.* at Art. 38 § 4; *see also* Doc. No. 117 at 57:16–19, 124:8–24, 167:7–9.)

31.     Each time a level of discipline is imposed, the employee's point total is reduced by 10 points.  (Ex. 1 at Art. 38 § 4.)

32.     All discipline imposed pursuant to the attendance points-system is "segregated

---

[4] Extended absences, however, are not considered for purposes of establishing a pattern.  (*See* Ex. 1 at Art. 38 § 2 ("Turn-ins greater than three (3) days will not be considered for purposes of establishing a pattern.").)

from, and shall not be considered in the imposition of discipline for other infractions or incidents." (*Id.* at Art. 38 § 5(a).)

33.     Separate from the attendance policy, employees are also given 120 days of sick time.[5] (Doc. No. 117 at 157:11–14.)

34.     In addition, a bus operator working a regular assignment is allowed "to lay-off for part of the assignment for a bona fide illness or other reason acceptable to the Authority," so long as there are sufficient extra list operators available. (Ex. 1 at Art. 23 §§ 1–2.)

35.     Finally, if an employee has a scheduling conflict, the CBA allows operators to exchange assignments with the approval of SEPTA and SMART. (*Id.* at Art. 11.)

### III.     *Lett's Diagnosis with End-Stage Renal Disease*

36.     In March 2017, Lett was diagnosed with end-stage renal disease. (Doc. No. 117 at 26:8–27:9.)

37.     Because of his medical condition, Lett underwent two surgeries[6] in March and April of 2017, and since then, he has had to receive dialysis four hours a day, three days a week. (*Id.* at 31:7–19; *see also* Ex. 25 (Oct. 9, 2017 Letter from Heather Costello, DaVita Grant One Dialysis Facility).)

38.     These dialysis treatments typically leave him feeling disoriented, requiring roughly four hours of recovery time before he begins to feel normal. (Doc. No. 117 at 32:18–33:11.)

39.     Lett has also been placed on the kidney transplant list and is waiting for a kidney

---

[5] It is not clear how this sick time works in connection with the attendance policy, which clearly calls for the accumulation of attendance points for sick days.

[6] Lett took leave under the Family Medical Leave Act ("FMLA") for these surgeries. (Doc. No. 117 at 29:22–30:11; Ex. 5 (Feb. 7, 2017 Letter from AmeriHealth Casualty Services).)

donor.  (*Id.* at 27:1–9.)

40.     Lett began dialysis in April 2017, after his second surgery.  (*Id.* at 36:16–19.)

41.     After initial treatments at other centers, Lett settled on a center operated by

DaVita, receiving dialysis treatments Mondays, Wednesdays, and Fridays from 3:00 p.m. to 7:00

p.m., which was the latest shift available at the time.  (*See* Ex. 25.)

### IV.     *Lett's Accommodation Request*

#### A.     <u>Lett's Request</u>

42.     Before returning to work, Lett researched the process for requesting an

accommodation from SEPTA and learned that he needed to meet with Jaqueline Hopkins,

SEPTA's ADA Coordinator.  (Doc. No. 117 at 38:21–39:4, 40:9–15; Doc. No. 118 at 52:16–25.)

43.     Hopkins began working as a consultant with SEPTA's Equal Employment

Opportunity ("EEO") Department in 2015 and was promoted to assistant director in 2016, and

finally, to director of the EEO Department in 2017.  (Doc. No. 118 at 52:17–53:8.)

44.     In all of her roles at the Department, Hopkins oversaw SEPTA's ADA

accommodations process—a process that she personally developed.  (*Id.* at 52:17–53:8, 86:8–

10.)

45.     As director, Hopkins received annual training on the ADA, and she provided

annual training to SEPTA supervisors on the interactive process required for any accommodation

request.  (*Id.* at 54:21–24, 55:21–57:2, 86:11–13; 87:24–88:3.)

46.     When Lett went to Hopkins's office in early May to meet with her, Hopkins

walked out of her office, handed Lett an envelope with SEPTA's accommodations paperwork,

and asked where he worked and what kind of accommodation he needed.  (Doc. No. 117 at 39:5–

11.)

47.     Lett responded that he worked out of the Victory Depot and that he needed an

accommodation to attend dialysis.  (*Id.* at 39:9–14.)

48.     Before he could explain further, Hopkins replied, "[W]ell, your union has a contract.  There's very little, if anything, we can do for you."  (*Id.* at 39:13–14.)

49.     She did not discuss possible alternatives to a scheduling change.  (*Id.* at 39:5–17; Doc. No. 118 at 80:15–19.)

50.     Instead, she walked away, telling Lett that she had a meeting to attend.  (Doc. No. 117 at 39:14–17.)

51.     This is the only conversation Hopkins had with Lett.[7]  (*Id.* at 39:16–17.)

52.     At trial, Hopkins conceded that a bus operator who could not make his runs due to a medical condition would likely need a reasonable accommodation and that the interactive process would involve her office.  (Doc. No. 118 at 57:3–6, 70:9–20; *see also* Ex. 3 at p. 4 (SEPTA's ADA Reasonable Accommodation Policy) (stating that once a request is made, an interactive dialogue is often required to determine what, if any, reasonable accommodation can be made).)

53.     For operators, the most common accommodation is time off.  (Doc. No. 118 at 89:18–21.)

54.     After his initial conversation with Hopkins, Lett turned to Union Vice Chairman Fulmore.  (Doc. No. 117 at 20:22–25, 39:18–21.)

55.     But like Hopkins, Fulmore told Lett, "[Y]ou don't have enough seniority and

---

[7] During trial, Hopkins testified that when she receives an accommodation request, she typically collaborates with SEPTA's medical director and the employee's managing director to determine whether the request is reasonable.  (Doc. No. 118 at 58:6–12.)  However, Hopkins did not speak to the medical director or Schirg about Lett's request.  (*See id.* at 57:21–58:1, 96:8–11.)  Nor did she speak with any Union officials about his request or possible alternatives.  (*Id.* at 15:3–6, 22:14–23:13, 80:15–19.  *But see id.* at 89:22–24 (Hopkins testifying that she typically does not speak to any Union officials when processing accommodation requests); *id.* at 31:24–32:6 (Harris testifying that in his 10 years as General Chairman, he has never participated in a reasonable accommodation request).)

there's probably nothing we can do."  (*Id.* at 39:21–22; *see also id.* at 44:25–45:7, 86:9–18, 92:14–17.)

56.     Despite Hopkins and Fulmore's less than promising responses, Lett reviewed SEPTA's Reasonable Accommodation Policy, completed the necessary paperwork, and returned it to Hopkins's office on May 10, 2017.  (Doc. No. 117 at 41:23–43:8; *see also* Ex. 3; Ex. 12 (Lett's request for a reasonable accommodation).)

57.     Lett's medical providers also completed a medical questionnaire which was submitted to SEPTA as part of Lett's formal accommodation request.  (Ex. 10 (Lett's Medical Questionnaire); *see also* Doc. No. 117 at 45:20–46:18.)

58.     In his request, Lett asked for scheduling flexibility so that he could attend dialysis treatments four hours a day, three times a week.  (*See* Ex. 12; Doc. No. 117 at 43:9–44:9.)

59.     Lett did not ask to be assigned to a specific shift or request higher seniority. (Doc. No. 117 at 44:13–19; *see also* Ex. 12.)

60.     Lett's physician likewise highlighted that Lett's work schedule needed to accommodate his dialysis treatments.  (Doc. No. 117 at 45:20–46:18; *see also* Ex. 10.)

61.     When Hopkins received Lett's request, she interpreted it as asking that he be allowed to pick a more desirable shift, an accommodation that would have required more seniority than Lett had.  (Doc. No. 118 at 92:10–15.)

**B.     Lett's Return to Work**

62.     On May 17, Lett returned from FMLA leave.  (Doc. No. 117 at 36:20–37:16.)

63.     At the time, the 3:00 p.m. dialysis shift at DaVita interfered with his work run, which was scheduled for 9:00 a.m. to 7:00 p.m.  (*Id.* at 37:8–16.)

64.     Because he had not heard from SEPTA about his accommodation request, Lett petitioned the dialysis center for a later slot and was eventually given the 8:00 p.m. to 12:00 a.m.

chair.[8]  (*Id.* at 37:20–38:7.)

65.     He also received approval to use intermittent FMLA leave to attend dialysis on the days that it interfered with his work schedule.  (*See* Ex. 7 (March 30, 2017 Letter from AmeriHealth Casualty Services, FMLA Unit).)

      **C.**     **Lett's Charge of Discrimination**

66.     On May 22, when Lett still had not heard from SEPTA about his request, he went to the Equal Employment Opportunity Commission ("EEOC") and completed an intake questionnaire, explaining that he needed an accommodation to attend dialysis.  (Doc. No. 117 at 47:15–49:12; *see also* Ex. 15 (EEOC Intake Questionnaire).)

67.     Using his responses, an EEOC representative prepared Charges of Discrimination against SEPTA and SMART for Lett to sign and submit.  (Doc. No. 117 at 47:1–14; *see also* Ex. 14 (Charge against SEPTA); Ex. 15 (Charge against SMART).)

68.     In his Charge against SMART, Lett asked "to be placed on a shift which starts at 4:30 a.m. to 9:00 a.m. because this would allow me to get off work by 2:00 p.m. in order to get my medical treatments done."  (Doc. No. 117 at 87:19–24; Ex. 16.)

69.     Harris received a copy of the Charge and contacted legal counsel from the Union's national office.  (Doc. No. 118 at 47:6–16.)

70.     No one from SEPTA or SMART reached out to Lett about his Charges.  (Doc. No. 117 at 44:20–24; Doc. No. 118 at 59:13–21.)

---

[8] Throughout his direct examination, Lett emphasized how difficult it was for him to change his dialysis schedule.  (*See* Doc. No. 117 at 36:12–15 (explaining that he may have been able to change his dialysis chair once or twice a year but not on a daily basis), 37:20–38:4 (explaining that his dialysis shift depended on the center having an open chair during a given time slot), 56:7–10 ("[W]ith the change in schedule every day, like, the dialysis center wouldn't be able to handle that type of accommodation."), 128:22–129:1 ("[G]oing to the dialysis center pretty much has to be a certain thing, you know, because, like I said, they have to have your chair set up specifically for you, what medicines you're going to take, how long you're going to treat.  So that's not something you can approach lightly.").

### D.   <u>Hopkins's Letter</u>

71.     As mentioned above, Hopkins believed Lett's accommodation request would have violated the Union's seniority policy.  (Doc. No. 118 at 92:10–15.)

72.     Accordingly, she sent Lett a letter advising him that his shift assignments are governed by a seniority system, which SEPTA is not inclined to violate without SMART's consent.  (Ex. 17 (May 22, 2017 Letter from Jacqueline Hopkins, Esq. to Aaron Lett).)

73.     However, if SMART agreed to modify Lett's work assignment, then SEPTA would facilitate a flexible schedule as a reasonable accommodation.  (*Id.*)

74.     Accordingly, she encouraged Lett to "speak to [his] union representative regarding the possibility of union concurrence to a modified shift."  (*Id.*)

75.     The letter ended with a note that Lett should feel free to contact Hopkins if he had any additional questions or concerns.  (*Id.*)

76.     Although Hopkins's letter was dated May 22, 2017, Lett did not receive it until August 2017.  (Doc. No. 117 at 50:16–19; *see also id.* at 131:28–132:4 (Denean Lett confirming that they received the letter on August 9, 2017).)

77.     Lett took a copy of the letter to Harris and Fulmore and, after explaining that he needed to attend dialysis three days a week, told them that SEPTA may be willing to help if SMART approved the request.  (*Id.* at 52:1–22; Doc. No. 118 at 10:20–11:24.)

78.     Harris reviewed the letter, made a copy of it, and spoke with Schirg, before returning the letter to Lett.  (Doc. No. 117 at 52:11–21; Doc. No. 118 at 10:20–13:13; *see also id.* at 15:7–16:9 (Harris testifying that he spoke with Schirg about the letter, the September picking, and how Lett preferred "a shift that came in from 4:00 a.m. getting off at 2:00 p.m.").)

79.     Around this time, Lett also spoke with his Union representative and local chairman, Stinsman.  (Doc. No. 117 at 53:1–14.)

11

80.     Stinsman told Lett that SMART was aware of his situation and that the Union was going to schedule a meeting with SEPTA to discuss his accommodation request.[9]  (*Id.*)

81.     Lett reminded Stinsman of the problem every time he saw him, but Stinsman always responded, "the meeting has not been scheduled yet."  (*Id.*; *see also id.* at 111:4–18.)

## V.     *The September 2017 Picking*

82.     As mentioned above, Lett was able to attend dialysis without issue in the summer of 2017 because his run finished at 7:00 p.m. and his dialysis shift did not start until 8:00 p.m. (*Id.* at 49:13–20.)

83.     However, Lett was unavailable for the next picking, in September 2017, because he was driving the bus during his scheduled pick time.  (*Id.* at 24:7–25:4, 53:17–54:11.)

84.     Per Union procedure, Lett submitted a pick slip, identifying three runs that he wanted Union representatives to select on his behalf.  (*Id.* at 53:17–54:11, 94:18–95:2.)

85.     But when it was his turn, those options were no longer available.  (*See id.* at 94:18–95:2.)

86.     Although Harris and Schirg knew that Lett had scheduling issues related to his dialysis, no one called Lett during his pick to tell him that his selections were unavailable.  (*See* Doc. No. 118 at 43:8–16 (Harris conceding that there have "been times that we reached out to certain people" but they did not reach out to Lett); Doc. No. 117 at 150:12–151:6 (Harris testifying that the Union has gone "to the control center to call the guys to say, yo, you're about

---

[9] Stinsman does not remember this conversation.  (Doc. No. 118 at 99:18–100:9 (testifying that he "remember[s] the case because there was talk with the union, but that's about it").)  Given his limited recollection of the events at issue in this case, the Court credits Lett's testimony—that Stinsman repeatedly told him the Union was going to schedule a meeting (*see* Doc. No. 117 at 53:1–14; *id.* at 50:9–11 ("[T]he next person I became familiar with was Dave Stinsman, and he was the only one that would actually take the time and listen to what I had to say."))—over Stinsman's testimony—that he lacked the authority to schedule a meeting because Harris was the only Union official who could call a meeting with SEPTA (*see* Doc. No. 118 at 100:4–9).

to miss your pick, and they'll pull the bus over and make the call.  SEPTA allows it").)

87.     In addition, although a 4:00 a.m. run was available, and both Schirg and Harris

knew that was a run that worked for Lett, the Union did not select that run.  (*Compare* Doc. No.

117 at 183:5–9 (Harris explaining that Ahesha Andrews picked a run with a 4:00 a.m. start time),

*with* Ex. 6 (showing Ahesha Andrews was one slot below Lett on the seniority roster), *and* Doc.

No. 118 at 42:25–43:4 (Harris testifying that if Andrews selected the 4:00 a.m. slot, "then that

shift was available for Mr. Lett").)

88.     Instead, the Union officials at the picking, including Harris, placed Lett on the

"Bus List."  (Doc. No. 117 at 53:17–54:11.)

89.     The Bus List is a backfill position with a schedule that varies from day to day.

(*Id.* at 55:20–56:10.)

90.     This was problematic for Lett, who needed a consistent work run so that he could

attend dialysis.  (*Id.* at 56:7–10.)

91.     Because Lett could not change his dialysis appointment from day to day or even

week to week, his assignment to the Bus List meant he would inevitably miss work to receive

treatment.  (*See id.* at 36:3–15.)

92.     Although Lett had previously used intermittent FMLA leave when his dialysis

conflicted with his work schedule, approval for that leave ended on September 29, 2017.  (*Id.* at

30:12–31:2; *see also* Ex. 7.)

93.     Senior operators rarely choose to work the Bus List, so that shift often goes to

new hires.  (Doc. No. 117 at 56:18–19.)

94.      Believing he had seniority over many of the new hires who would have been

assigned to it, Lett asked Harris if he could come in at 4:00 a.m. every day while on the Bus List.

(*Id.* at 56:13–21.)

95.    Harris refused on the grounds that it would violate seniority.  (*Id.*)

96.    Lett was concerned that his assignment to the Bus List would result in multiple unexcused absences, which in turn, would result in the accumulation of attendance points under SEPTA's attendance policy.  (*See id.* at 57:3–58:7.)

97.    And, having been disciplined by SEPTA in the past, he believed the accumulation of points would quickly result in his termination:

> I was getting attendance points, and according to the policy, the way I interpret it, if I had up to 20 attendance points, then I would be subject to progressive discipline.
>
> Well, I already had progressive discipline on my performance since I've been at SEPTA, so I was nervous because I think I was at the third or the final stage of my progressive discipline with operating a bus.  So now I had this situation with my attendance, and I'm thinking the two will be combined.  And because I'm not getting accommodated and I'm accruing points almost up to 20 that eventually I'll get terminated.
>
> So at this point in October—actually my Family Medical Leave was up to September 29, . . . [a]t that point I had to make a decision that I had to live, so that's what I did.

(*Id.*)

98.    Believing he was being asked to choose between working and attending dialysis—and that if he chose work, he would be terminated in any event—Lett stopped reporting to work on October 2, 2017.  (*Id.* at 57:3–58:7.)

## VI.    *SEPTA's Termination Letter*

99.    Four months later, on January 29, 2018, Schirg sent Lett a letter explaining that he had exhausted his contractually-entitled 120 days of sick leave and was being dropped from SEPTA's employment rolls effective immediately.  (Ex. 27 (Jan. 29, 2018 Letter from James Schirg to Aaron Lett); *see also* Doc. No. 117 at 58:24–59:19.)

14

100.    A few days later, Lett called Harris about the termination, and Harris told him that he had a 120-day "mirror period" during which he could return to work without losing his seniority.  (Doc. No. 117 at 59:22–60:5, 105:23–25; *see also* Ex. 32 (Lett's handwritten notes from the call).)

101.    However, Harris warned that if Lett missed work to attend dialysis, he would accrue attendance points.  (Doc. No. 117 at 60:5–9.)

102.    Lett asked Harris to file a grievance on his behalf, on the grounds that SEPTA had discriminated against him in violation of the CBA, but Harris refused, saying there was no grievance to file.  (*Id.* at 59:22–60:3, 62:6–11.)

103.    Harris said he could try to broker a deal to get Lett an overnight shift if Lett changed his dialysis schedule, but he cautioned that there was no guarantee.  (*Id.* at 60:10–12, 62:5–16, 106:3–107:12.)

104.    Because Harris could not guarantee the overnight shift, and given the difficulties involved in changing his dialysis schedule, Lett chose not to change chairs.  (*Id.* at 63:13–18, 107:8–109:2, 128:19–129:13.)

105.    Lett did not return to SEPTA during the mirror period, and no one from SEPTA or SMART spoke with him again.  (*Id.* at 63:13–18.)

## VII.    *Lett's Job Search*

106.    Because Lett was still waiting for resolution on his Charges of Discrimination with the EEOC, he did not initially start looking for a new job.  (*Id.* at 63:21–24, 68:6–23, 82:21–84:14.)

107.    On April 17, 2019, more than a year after Lett left SEPTA, the EEOC dismissed his case.  (*See* Ex. 47 (EEOC Dismissal and Notice of Rights on Lett's Charge against

SMART).)

108.  From April 25 to May 14, 2019, Lett applied for positions with New Jersey

Transit, Waste Management, and Delaware Transit Corporation.  (Exs. 38–40.)

109.   Lett did not hear back from New Jersey Transit or Delaware Transit.  (Doc. No.

117 at 63:25–65:3.)

110.  And although he interviewed with Waste Management, he did not hear back from

the company after disclosing his medical condition.  (*Id.*)

111.  In February 2020, Lett applied for a position with Amtrak (*see* Ex. 37), and in

May 2020, he applied for a position with Frito Lay (*see* Ex. 41).

112.  Although he received an offer to interview with Frito Lay, he did not attend the

interview because his car broke down.  (Doc. No. 117 at 80:18–81:10.)

113.  In addition to these companies, by June 15, 2020, Lett had applied for positions at

Liberty Coca-Cola, AT&T, Molson Coors, Tyson Foods, Dallas Transportation Company,

Liggett Vector Brands, and HERR's Snacks.  (*Id.* at 67:6–68:5.)

114.  Despite his efforts, Lett did not find new employment, and he remained

unemployed at the time of trial.  (*Id.* at 70:25–71:3.)

115.  Currently, Lett has regained employment with SEPTA in a position with a

different union.  (*Id.* at 16:15–17.)

## VIII.  *Lett's Damages*

116.  In October 2018, Lett was earning approximately $20.42 per hour, working 60

hours per week.  (*Id.* at 69:15–21; *see also* Ex. 48 (Lett's 2017 W-2); Doc. No. 117 at 69:22–

70:16.)

117.  At the time, Lett also received full benefits, including health care and life

insurance, both of which he lost when he was fired in January 2018.  (Doc. No. 117 at 70:17–24.)

118.    In addition to his lost salary and benefits, Lett testified that he suffered emotionally from his termination.  (*Id.* at 71:4–78:5.)

119.    While at SEPTA, Lett was the breadwinner for his family, and he felt like "less of a man" when his wife had to go back into the workforce while he stayed at home.  (*Id.* at 71:4–10, 76:6–77:2.)

120.    In addition, the Union's refusal to help him left Lett feeling helpless and frustrated, and he suffered from anxiety, mood swings, and depression.  (*Id.* at 76:8–77:12; *see also id.* at 132:18–133:3 (Denean Lett testifying that her husband was emotionally distressed and that she had never seen him so depressed at any other point in their marriage).)

121.    In February 2018, Lett began treating with Equilibria Psychological and Consultation Services.  (*Id.* at 72:8–16; *see also* Ex. 34 (Equilibria medical records).)

122.    In December 2018, he switched care providers and began therapy with Iryna Zhyrenko of Robin Lowey and Associates, LLC.  (Doc. No. 117 at 73:8–75:9; *see also* Ex. 35 (Zhyrenko medical records).)

123.    He treated with Zhyrenko until June or July of 2019, when he switched to Nefertiti Isoke, who is affiliated with Zhyrenko's practice.  (Doc. No. 117 at 75:4–15 (explaining that he changed practitioners for insurance reasons).)

## CONCLUSIONS OF LAW

Lett argues that SEPTA discriminated against him and that SMART aided and abetted that discrimination.  Although Lett settled his claims against SEPTA before trial, he must still prove an underlying violation by SEPTA to succeed on his aiding and abetting claim against SMART.  *See McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415 (E.D. Pa. 2019) ("Even if an

individual employee is a supervisor for purposes of aiding and abetting liability under the PHRA, the Plaintiff must show a primary violation by the employer." (quotation marks omitted)); *Williams v. Aramark Campus LLC*, Civil Action No. 18-5374, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020) ("For liability to be imposed on an aiding and abetting theory, however, there must be a cognizable predicate offense, *i.e.* a violation by the employer of the PHRA's or PFPO's primary anti-discrimination provision." (cleaned up)).  Therefore, we analyze whether SEPTA discriminated against Lett when it failed to accommodate his disability, before addressing whether SMART aided and abetted that discrimination.  We then determine Lett's damages, if any.

## I.     *Disability Discrimination*

1.      The PHRA[10] prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)).

2.      To establish a claim of disability discrimination under the ADA, an employee must show by a preponderance of the evidence that:  (1) "she is a disabled person within the meaning of the ADA"; (2) "she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "she has suffered an otherwise adverse employment decision as a result of discrimination."  *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 591 (E.D. Pa. 2017).

3.      Before trial, the parties stipulated that Lett has a qualifying disability—end-stage

---

[10] The same legal standards apply to the ADA, the Rehabilitation Act, and the PHRA.  *See, e.g.*, *Fromm v. MVM, Inc.*, 371 F. App'x 263, 269 n.3 (3d Cir. 2010) ("We have previously held that the ADA and the Rehabilitation Act apply the same standard to determine liability, and that the ADA and PHRA are interpreted coextensively." (internal citations omitted)).

renal failure, requiring dialysis three times per week (Doc. No. 92 at ¶ 4), and SMART has not

contested that Lett was qualified to perform the essential functions of the bus operator position,

(*see generally* Doc. No. 25; *see also* Doc. No. 117 at 22:3–23:18 (Lett testifying about the duties

of a bus operator and his qualifications to perform those duties)).

4.      Instead, the parties dispute whether Lett suffered an adverse employment action.

Lett claims that he suffered two adverse employment actions, first when SEPTA failed to

accommodate his disability, and second, when that failure to accommodate forced him to stop

appearing for work in October 2017.  (Doc. No. 124 at pp. 25–34.)  SMART argues that Lett did

not suffer an adverse employment action because SEPTA engaged in the interactive process.

(Doc. No. 125 at p. 26.)

   A.      **Failure to Accommodate**

5.      "Discrimination under the ADA encompasses not only adverse actions motivated

by prejudice and fear of disabilities, but also includes failing to make reasonable

accommodations for a plaintiff's disabilities."  *Taylor*, 184 F.3d at 306; *see also Mercer v. Se.*

*Pa. Transit Auth.*, 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) ("[F]ailure to accommodate is a

separately actionable 'unlawful employment practice' akin to wrongful termination or failure to

hire."); *Sharbaugh v. W. Haven Manor, LP*, Civil Action No. 14-1723, 2016 WL 6834613, at *8

(W.D. Pa. Nov. 21, 2016) ("An employer's failure to reasonably accommodate the disabilities of

an otherwise qualified employee constitutes an adverse employment action under the third

element of the prima facie case of generic disability discrimination." (citing 42 U.S.C. § 12112)).

Lett claims that SEPTA failed to accommodate him when it refused to engage in the interactive

process.  *See Sharbaugh*, 2016 WL 6834613, at *9 ("Failure to engage in the interactive process

is not an independent violation of the ADA; it is a way in which an employee can demonstrate

that an employer breached its duty to provide reasonable accommodations.").

6.      An employer fails to engage in the interactive process when:  (1) "the employer knew about the employee's disability;"  (2) "the employee requested accommodations or assistance for his or her disability;"  (3) "the employer did not make a good faith effort to assist the employee in seeking accommodations;" and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319–20.[11] SMART disputes only the third prong, arguing that SEPTA made a good faith effort to help Lett in seeking accommodations.  (Doc. No. 125 at p. 26.)

7.      An employer acts in good faith when it takes steps like "meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered the employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." *Taylor*, 184 F.3d at 317.

8.      By contrast, an employer acts in bad faith when it "obstructs or delays the interactive process," otherwise fails to "help the other party determine what specific accommodations are necessary," or "fails to communicate by way of initiation or response." *Id.* at 312 (quotation marks omitted); *see also Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations

---

[11] Because a failure to accommodate claim does not require that the "employer's action be motivated by a discriminatory animus directed at the disability . . . the *McDonnell Douglas* test does not apply."  *Reyer*, 243 F. Supp. 3d at 595 (quotation marks omitted); *see also Campo v. Mid-Atlantic Packaging Specialties, LLC*, 564 F. Supp. 3d 362, 387–88 (E.D. Pa. 2021) ("Because failure to accommodate an employee's disability is itself evidence of discrimination under the ADA, there is no need in such a case for indirect proof of discrimination.  Thus, the *McDonnell Douglas* burden shifting framework does not apply." (cleaned up)).

are necessary.").

9.      Here, SEPTA's efforts amounted to bad faith.  In their first and only interaction,

Hopkins did little more than tell Lett that SEPTA likely could not help him and hand him the

company's accommodation paperwork.  *See McIntyre v. Archuleta*, Civil Action No. 2:14–cv–

00327, 2015 WL 4566730, at *11 & n.12 (W.D. Pa. July 29, 2015) (finding the plaintiff's

supervisor acted in bad faith where there was "seemingly no evidence that the Defendant made

*any* effort to help McIntyre find an accommodation" and where the supervisor "testified at his

deposition that he did not recall McIntyre" asking to work from home as a reasonable

accommodation, but "that, even if she had, the request would have been denied" under the

company's policy).  And after receiving Lett's accommodation paperwork, Hopkins essentially

did nothing.  She did not speak with SEPTA's medical director and Lett's managers to discuss

possible accommodations—even though those are steps she typically takes in these situations—

nor did she meet with Lett to discuss his request or propose alternative accommodations that may

have been available given her knowledge that the Union was very unlikely to consent to an

exception to the seniority system.  Instead of working with Lett to find an alternative

accommodation, Hopkins sent him a letter—three months after he submitted his paperwork—

reiterating that SEPTA could not help him and directing him to speak with his Union.

10.      Hopkins's short conversation with Lett and follow up letter fall far short of the

good faith effort required by the PHRA.  *See Taylor*, 184 F.3d at 314 ("[T]he school district had

more than enough information to put it on notice that Taylor might have a disability, and

therefore, in order to trigger the school district's obligation to participate in the interactive

process, Taylor or her representative only needed to request an accommodation."); *Petti v. Ocean*

*Cnty. Bd. of Health*, 831 F. App'x 59, 63 (3d Cir. 2020) ("Once an employee requests a

reasonable accommodation, her employer must assist the employee in seeking accommodations .

. . .” (cleaned up)); *Campo*, 564 F. Supp. 3d at 389 (“Once the employer knows of the disability

and the employee’s desire for accommodations, the burden shifts to the employer to engage in

the accommodation process.” (quotation marks omitted)).  *Contra Gardner v. SEPTA*, 410 F.

Supp. 3d 723, 743 (E.D. Pa. 2019) (finding SEPTA made a good faith effort to engage in the

interactive process where “[t]he record demonstrates that SEPTA considered Plaintiff’s request,

sought assistance or input from other resources,” such as an independent medical examination,

and “attempted to discuss alternatives” because the plaintiff’s requested accommodation would

have violated the applicable CBA); *Supinski v. Super Mkt. Serv. Corp.*, 3:CV-02-0271, 2005 WL

8168982, at *9 (M.D. Pa. Dec. 20, 2005) (“The evidence, however, does suggest that SMS

engaged in good faith in the interactive process with Plaintiff:  Defendants explained the

collective bargaining agreement to Plaintiff; suggested seeking volunteers to switch positions

with her; and responded to correspondence from Plaintiff’s lawyer.”).

  11. SMART argues that Lett, not SEPTA, caused a breakdown in the interactive

process, asserting that “Plaintiff was instructed to talk to the Union about an exception to

seniority, was given an answer, and never returned to SEPTA despite Director Hopkins[’s]

statement in the letter that he should do so with any questions or concerns.”  (Doc. No. 125 at

p. 26.)  The Court strongly disagrees.  For one, we emphasize that Lett did not receive Hopkins’s

letter until months after he first went to her for help.  And based on that letter and his earlier brief

exchange with Hopkins, Lett reasonably believed that his only option was to follow up with the

Union about his request.  Lett’s persistence with Union officials, instead of Hopkins, is

particularly reasonable given Stinsman’s assurances that SMART officials and SEPTA

management were aware of Lett’s situation and had scheduled a meeting with SEPTA to discuss

it.

12.     In addition, Lett's actions throughout this process show that he repeatedly tried to work with SEPTA to find a reasonable accommodation:  He timely notified SEPTA's ADA Coordinator of the need for an accommodation before returning from FMLA leave; he submitted the appropriate documentation, including an accommodation request form and medical records; he worked with DaVita to rearrange his dialysis schedule; he followed up with his Union representatives at SEPTA's direction; and he never avoided communications from SEPTA or misrepresented his situation. *Contra Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 333 (3d Cir. 2003) (attributing breakdown in interactive process to the employee where the employer granted her accommodation request on three prior occasions, the employee had notice that she would need to request additional accommodation if her temporary disability persisted, and "not only did she fail to communicate, she affirmatively misrepresented her situation, thus thwarting [her employer's] attempts to learn about her condition" (quotation marks omitted)); *Petti*, 831 F. App'x at 64 (finding that the interactive process ultimately broke down because the employee failed to respond to the employer's request for a meeting to discuss its proposed accommodations).

13.     In short, the Court cannot find that SEPTA acted in good faith when it did little more than hand Lett paperwork and then, months later, send him a back-dated letter directing him to the Union.  *See Reyer*, 243 F. Supp. 3d at 596 (denying summary judgment on the employee's "failure to accommodate/interactive process claim" where the evidence showed that the employer's "representatives did not 'meaningfully' discuss the [employee's] lifting restriction either amongst themselves or with [the employee]"); *Campo*, 564 F. Supp. 3d at 390 (finding the plaintiff "raised a genuine dispute of material fact as to whether [his employer]

engaged in the interactive process" where the plaintiff's supervisor "admits that no alternative accommodations were presented to [the employee]," and there was no evidence that the supervisor directly asked the employee what accommodation he wanted).

14.     Because SEPTA acted in bad faith, Lett has proven a failure to accommodate claim as against it.

### B.     Constructive Discharge

15.     Lett asserts a second, related but distinguishable, adverse action, arguing that SEPTA's refusal to engage in the interactive process resulted in his constructive discharge. (Doc. No. 124 at p. 34.)

16.     Unlike a failure to accommodate claim, a claim for constructive discharge is reviewed under the *McDonnell-Douglas* burden shifting framework.  *Zezulewicz v. Port Auth. of Allegheny Cnty*, 290 F. Supp. 2d 583, 593 (W.D. Pa. 2003)

17.     Under that framework, "a plaintiff must first establish a prima facie claim of discrimination."  *Mercer*, 26 F. Supp. 3d at 445.

18.     "If the plaintiff succeeds in making out a prima facie case, . . . the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action."  *Id.* (quotation marks omitted).

19.     If the defendant can proffer a legitimate reason, the "presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination."  *Id.*

20.     The Third Circuit follows the majority view on constructive discharge, employing an "objective test" that analyzes whether "the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."  *Colwell v. Rite Aid*

*Corp.*, 602 F.3d 495, 502 (3d Cir. 2010).

21.     To answer this question, the court should consider "whether the employer (1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." *Id.* at 502–503 (cleaned up).

22.     These factors are not, however, an "absolute requirement for recovery," and the absence of some or all of the factors "is not necessarily dispositive." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001).

23.     Courts in this Circuit have generally recognized that an employer's failure to accommodate can give rise to an inference of constructive discharge. *See Pagonakis v. Express LLC*, 315 F. App'x 425, 430 n.4 (3d Cir. 2009) ("To the extent Pagonakis asserts that Express' alleged failure to accommodate, rather than a hostile work environment, resulted in her constructive discharge, she may present that theory to a jury."); *see also Rabuffo v. VCA Smoketown Animal Hosp.*, No. 5:15-cv-06378, 2016 WL 3165606, at *6 (E.D. Pa. June 6, 2016) ("Courts have observed that allegations of a failure to accommodate may provide support for a constructive discharge claim in some circumstances . . . ." (quotation marks omitted)); *Busch v. Oswayo Valley Sch. Dist.*, Civil Action No. 1:15-cv-239, 2016 WL 5394085, at *8 (W.D. Pa. Sept. 27, 2016) ("In the context of disability discrimination, several courts have noted that a failure to accommodate or to engage in the interactive process may support an inference of constructive discharge."). *But see Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) ("Colwell argues that Rite Aid's failure to accommodate her disability was an adverse employment action that supports her claim for constructive discharge.  The EEOC agrees.  We

consider Rite Aid's failure to accommodate separately from her constructive discharge claim.").

24.     Nevertheless, "courts have also been wary of regarding every failure to accommodate an employee as a constructive discharge." *Rabuffo*, 2016 WL 3165606, at *6; *see Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993) ("In this case, the district court held that NIH had constructively discharged Dr. Johnson because her supervisors were on notice of her need for changes in her working conditions but failed to affirmatively accommodate her.  We think that this standard sweeps too broadly; rather than cabining the doctrine of constructive discharge, the standard adopted by the district court threatens to convert every failure to accommodate under the Rehabilitation Act into a potential claim for constructive discharge."); *McIntyre*, 2015 WL 4566730, at *12 ("The fact that McIntyre has demonstrated that an issue of fact remains as to whether the Defendant failed to provide an[ ] accommodation does not necessarily mean that the Defendant could be found liable for constructive discharge."); *Hurley-Bardige v. Brown*, 900 F. Supp. 567, 574 (D. Mass. 1995) ("Does the failure to make reasonable accommodation amount *per se* to constructive discharge?  Usually not, and definitely not here.").

25.     To determine whether an employer's failure to accommodate rises to the level of a constructive discharge, courts often look to whether the employee repeatedly requested accommodation and that request was both denied and no reasonable alternative was offered.[12] *See Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 303 (6th Cir. 2019) ("In the face of

---

[12] At least one court has acknowledged that the initial failure to accommodate may, without additional prompting, create circumstances so intolerable that a reasonable person would have felt compelled to resign.  *See Hurley-Bardige*, 900 F. Supp. at 573 n.7 ("The Court can certainly imagine instances where the failure to make reasonable accommodation, by itself, could create a working environment so hostile that a reasonable employee would resign his or her position.  For example, were an employer to refuse to build a ramp or elevator for an employee confined to a wheelchair, making it impossible for the employee to get to work, the employer would be guilty of constructively discharging that employee in violation of the Rehabilitation Act.  Likewise, were an employer to refuse to transfer an employee with a respiratory condition to a smoke-free work station, this failure to accommodate could create a hostile work environment sufficient to constitute constructive discharge.").

Coldwater's repeated failures to honor Morrissey's accommodation requests, a reasonable plaintiff in her position would have felt compelled to resign."); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) ("[W]hen an employee makes a repeated request for an accommodation and that request is both denied and no other reasonable alternative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable."); *Johnson*, 991 F.2d at 132 ("[A] complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge."); *Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832, 865–66 (E.D. Mich. 2017) (granting summary judgment in the defendant's favor on the plaintiff's constructive discharge claim because there was no "evidence on which a jury could reasonably conclude that Ford repeatedly denied requested accommodations . . . . Ford placed Plaintiff on full paid leave while it investigated his accommodation request—a far cry from forcing him to endure intolerable working conditions"); *Upchurch v. Mount Carmel Health Sys.*, 893 F. Supp. 2d 899, 913 (S.D. Ohio 2012) ("Upchurch does not have enough evidence to support a 'constructive discharge' claim on the theory that Mount Carmel's actions constituted a foreseeable failure to accommodate. First, unlike in *Talley*, Upchurch did not make repeated requests for accommodation of a disability—he merely requested *once* that he be given 'time off' because he 'couldn't do this anymore.' Second, unlike in *Talley* where the employer's attempts to negotiate accommodation had broken down into a 'complete failure to accommodate' her, Mount Carmel had just recently taken steps to help Upchurch, by granting him administrative leave and referring him for psychiatric testing."); *Harvey v. Am.'s Collectibles Network, Inc.*, No. 3:09-CV-523, 2011 WL 182864, at *10 (E.D. Tenn. Jan. 20, 2011) ("There was no complete failure to accommodate in this case nor were there repeated requests for an accommodation that were

denied without a reasonable alternative.").

26.     Similarly, if the failure to accommodate is accompanied by harassment from fellow employees or any of the six factors described in *Colwell*, the court is more likely to find constructive discharge.  *See McIntyre*, 2015 WL 4566730, at *12 ("The record contains evidence from which, considered as a whole, a factfinder could find that McIntyre was constructively discharged:  [1] In October of 2011, shortly after she began to suffer from shingles, McIntyre was sent [an unprompted] retirement estimate . . . [2] [McIntyre's manager] asked McIntyre when she intended to retire . . . [3] Shortly before her retirement . . . McIntyre received an unacceptable performance rating . . . [and 4] [O]n top of all that, the Defendant refused to consider accommodating McIntyre, or to engage in the interactive process with her in order to determine whether a reasonable accommodation was possible."); *Bluemling v. PNC Bank*, Civil Action No. 08-1421, 2010 WL 3811725, at *23 (E.D. Pa. Aug. 27, 2010) ("Plaintiff has also testified that he returned to find his name tag removed from his cubicle, a final written warning and a directive that he complete the [Health Care Provider] Questionnaire as a condition of continuing his employment, and he saw that PNC was not accommodating his disability but instead responded with corrective actions.  Under these circumstances, the trier of fact might conclude that he left because he saw the handwriting on the wall, and/or that PNC's complete failure to accommodate his disability constituted a constructive discharge." (cleaned up)); *see also Kent v. Derwinski*, 790 F. Supp. 1032, 1139–41 (E.D. Wash. 1991) (finding constructive discharge where the employer failed to reasonably accommodate the employee and the employee was taunted by coworkers, ridiculed for having a disability, and inappropriately disciplined by her supervisor).

27.     To better understand when a failure to accommodate rises to the level of

constructive discharge, the Court considers two cases, the Sixth Circuit's opinion in *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2008) and the Seventh Circuit's opinion in *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 431 (7th Cir. 2000).

28.     In *Talley*, the plaintiff, who suffered from degenerative osteoarthritis of her cervical and lumbar spine, worked as a cashier at a Family Dollar.  542 F.3d at 1103.  Because of her condition, the cashier suffered "such pain in her legs and back that she [wa]s unable to stand or sit for long periods of time," and after suffering a fall in March 2004, "she could not stand for more than fifteen minutes without experiencing severe pain."  *Id.*  Although some of the cashier's supervisors allowed her to bring a stool to work to use at the register, the store manager objected to her using the stool after her fall.  *Id.*  At her supervisor's request, she "agreed to obtain a doctor's note that would state that she could perform her duties as required if she had a stool to sit upon."  *Id.*  However, when she gave the note to her supervisor, he refused to open it and indicated that he would schedule a meeting between the two of them and the district manager.  *Id.* at 1104.  The employee left the store and never returned.  *Id.*  In the days that followed, she called her supervisor several times to arrange the meeting with the district manager, but the meeting never happened, and in February 2005, Family Dollar formally terminated her employment, citing "job abandonment" as its reason.  *Id.*

29.     On appeal, the Sixth Circuit found "a genuine issue of material fact regarding whether [the cashier's] working conditions would have been so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  *Id.* at 1109.  In particular, the court found that the cashier "produced sufficient evidence that may lead a jury to conclude that the defendants intended for her to resign and that it was foreseeable that she would when they (1) denied her use of the stool after years of being able to use it, (2) refused to read a

doctor's note that she delivered upon their request, (3) failed to organize a meeting to discuss the issue, and (4) failed to contact her regarding the status of the meeting or with other alternatives to resolve the issue." *Id.*; *see also Smith v. Henderson*, 376 F.3d 529, 537–38 (6th Cir. 2004) ("We do not believe that Smith's situation is comparable to that of employees who prematurely quit their jobs in apprehension that their situations would not improve. . . . Those cases do not involve an individual like Smith, who allegedly was worked to exhaustion and poor health by an employer who was aware of the individual's disability, but nevertheless refused to honor a reasonable accommodation, and denied another, that would have precluded such an overwhelming workload.").

30.     By contrast, in *Sears, Roebuck & Co.*, the Seventh Circuit found that the plaintiff's working conditions were not so intolerable that quitting was her only option.  233 F.3d at 441.  The plaintiff, a sales associate at a department store, had nerve damage in her right leg that prevented her from walking long distances, including the distance from her department to the employee cafeteria and the employee parking lot.  *Id*. at 435.  Her supervisor initially allowed her to eat lunch in the apparel stockroom to accommodate her disability, but after a few months, the supervisor announced a "blanket policy that eating in the stockroom was forbidden."  *Id.*  Not long after this denial, the associate began using a cane to walk, and in the months that followed, she continued to ask her supervisors about possible accommodations, with varying success.  *Id.* at 435–36 (explaining that her direct supervisor suggested that the associate park in the "handicap space outside her department," but this "did not lessen [the associate's] commute, as she still had to walk across the store to the employee check-in location before she could commence work in her department"); *id.* (describing how a different supervisor denied the associate's request to use the shoe stockroom as a shortcut to reach her car).  A couple of months

later, the supervisor gave the associate a new work schedule that required her to work Thursday

evenings and Fridays.  *Id.* at 436.  The associate protested, arguing that that she was "unavailable

to work at those times" because she played bingo on Thursday nights and liked to clean her

home on Fridays.  *Id*.  When the supervisor refused to change the schedule, the associate

"believed she had no choice other than to resign."  *Id.*

31.     The district court granted summary judgment in the store's favor on the

employee's constructive discharge claim, finding, among other things, that the associate was not

"subjected to conditions that were so intolerable as to require resignation."  *Id.*  On appeal, the

Seventh Circuit agreed, finding that the store's decision to have her work Thursday nights and

Fridays, "which at the very most would require [her] to slightly rearrange her schedule," did not

amount to an action that was "beyond ordinary discrimination."  *Id.* at 441.  In addition, the

record showed that "there was poor communication between both sides" about the associate's

need for an accommodation, and the court found it telling that "instead of discussing the new

work schedule and [supervisor]'s refusal to allow [the associate] to use the shoe room shortcut,

[the associate] resigned."  *Id.*

32.     Lett's case is a close call, seeming to fall somewhere between *Talley* and *Sears,*

*Roebuck & Co.*  Nevertheless, after reviewing the evidence submitted at trial, the Court finds by

a preponderance of the evidence that a reasonable person in Lett's position would have felt, as

Lett did, that he had no choice but to resign when SEPTA refused to accommodate his disability

despite his repeated requests for help.

33.     In particular, the Court finds it notable that:  (1) When Lett first approached

Hopkins, SEPTA's director for ADA compliance, she brushed him off and told him that there

was probably nothing she could do; (2) When he submitted his accommodation paperwork, he

heard nothing from SEPTA about his request until three months later, when Hopkins said SEPTA would assist him only if the Union agreed to change his schedule; (3) Hopkins never met with Lett to discuss his needs or possible alternative accommodations; (4) Schirg, Lett's direct supervisor at SEPTA, like Hopkins, did not meet with Lett or offer any assistance; (5) When the September picking came around, neither Schirg nor the attending Union officials called Lett to discuss his pick, and instead, selected a run that they knew he *could not* work with his dialysis schedule;  (6) While on the bus list, Lett began accruing attendance points when he missed work to attend dialysis; and (7) When Lett failed to come to work for months, Schirg never reached out to speak with him, but instead sent him a letter explaining that he had been dropped from the rolls effective immediately.

34.     The Union takes issue with Lett for not reaching out to Hopkins after the September picking, noting that the back-dated letter ended by telling him to please reach out if he had any additional concerns.  (Doc. No. 125 at p. 26.)  We agree that this failure weighs against a finding of constructive discharge; however, we do not find it dispositive, given Hopkins and Schirg's complete failure to assist Lett—or even to take his concerns seriously—at any point in the process.  Additionally, the fact Lett did not receive Hopkins's letter, which was dated May 22, 2017, until August 2017, is also relevant.

35.     Moreover, we strongly disagree with the Union's argument that Lett slept on his rights and then quit without explanation.  To the contrary, Lett attempted to meet with SEPTA's ADA director; timely completed SEPTA's accommodations paperwork; had his physicians fill out SEPTA's medical questionnaire; rearranged his dialysis treatments to accommodate his work schedule; spoke with the Union at SEPTA's direction; provided a copy of Hopkins's letter to the Union; repeatedly asked his Union representatives to schedule a meeting with SEPTA about an

accommodation;[13] in June 2017, chose a run that would not overlap with his 8:00 p.m. dialysis chair; used FMLA leave to attend dialysis while it was available; and in September 2017, submitted pick slips requesting runs that would not overlap with his dialysis shift.

36.     In short, Lett has proven by a preponderance of the evidence that he was constructively discharged in October 2017 when SEPTA forced him to choose between reporting for his shifts on the bus list and attending life-saving dialysis—with the belief that if he chose dialysis, he would accumulate attendance points and ultimately be fired in any event.[14]  *See Talley*, 542 F.3d at 1109 ("When Talley was told on September 10, 2004, that she would not be allowed to use a stool, she may reasonably have believed that she would either have to work her entire shift without a stool—conditions she alleges were intolerable due to severe pain—or resign."); *cf. Rabuffo*, 2016 WL 3165606, at *6 ("Here, Rabuffo alleges that VCA constructively discharged her when, following her surgery, it refused to accommodate her disability and return her to employment, despite her repeated requests.  This is sufficient to state a claim for constructive discharge.").

*       *       *

Lett has proven that SEPTA discriminated against him in violation of the PHRA because it refused to engage in the interactive process and its failure to accommodate Lett resulted in his

---

[13] Lett understood the importance of bringing SEPTA and SMART together to discuss his accommodation.  Indeed, he went to the EEOC in the hopes that it would lead to a meeting with SEPTA and the Union.  (Doc. No. 117 at 47:12–14 (Lett testifying that "my thinking by going to the EEOC is that this is an entity that could probably bring both parties together and discuss some type of accommodation program.").)

[14] Although the *McDonnell Douglas* framework governs our analysis, SMART has not identified a legitimate nondiscriminatory reason for Lett's discharge, and therefore, has failed to carry its burden. *See Mercer*, 26 F. Supp. 3d at 445 ("If the plaintiff succeeds in making out a prima facie case, . . . the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action."  If the defendant can proffer a legitimate reason, the "presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination.").

33

constructive discharge in October 2017.

## II.      *Aiding and Abetting*

37.      In addition to prohibiting employment discrimination, the PHRA also makes it an

"unlawful discriminatory practice" for any "labor organization . . . to aid [or] abet . . . the doing

of any act declared by this section to be an unlawful discriminatory practice . . . ."  43 Pa. Stat. &

Cons. Stat. § 955(e).

38.      "[A] defendant may be liable under § 955(e) either as a result of [its] own

discriminatory conduct, or for refusing to take prompt and remedial action against any

discrimination suffered by an employee."  *Hollinghead v. City of York*, 912 F. Supp. 2d 209, 223

(M.D. Pa. 2012) (quotation marks omitted)); *see also id.* ("Under this aiding and abetting

provision of the statute," a plaintiff may advance claims against individuals "who bear

responsibility for implementing an allegedly unlawful discriminatory practice." (cleaned up)).

39.      As discussed above, Lett has proven that SEPTA failed to accommodate him

when it refused to engage in the interactive process and that this failure to accommodate resulted

in his constructive discharge.

40.      Before we can determine whether SMART aided and abetted that discrimination,

we must determine which legal standard applies to an aiding and abetting claim under the PHRA.

Lett urges us to follow the civil standard for aiding and abetting liability adopted by the Third

Circuit in *Failla v. City of Passaic*, 146 F.3d 149 (3d Cir. 1998).  SMART argues that we must

apply the criminal standard for liability that the Third Circuit applied in *Dici v. Pennsylvania*, 91

F.3d 542 (3d Cir. 1996).

41.      In *Failla*, the Third Circuit analyzed the aiding and abetting provision in New

Jersey's Law Against Discrimination ("NJLAD" or "LAD"), which is nearly identical to the

34

PHRA provision we consider here, and it concluded that "the New Jersey Supreme Court would follow the Restatement of Torts to define aiding and abetting liability."  146 F.3d at 157–58.  In reaching this conclusion, the Third Circuit began by reviewing and rejecting a District of New Jersey case, *Tyson v. CIGNA Corp.*, *see id.* at 156–57, which held that the NJLAD encompasses a criminal standard for aiding and abetting, *see Tyson v. CIGNA Corp.*, 918 F. Supp. 836, 849 (D.N.J. 1996) ("Because *Baliko*," an opinion from an intermediate New Jersey state court, "analogizes explicitly to the criminal context, we believe a comparable finding of intent is required in order to find accomplice liability [under the NJLAD].  Thus, in order to aid or abet another to commit an unlawful act, it is necessary that the defendant wilfully [sic] and knowingly associate himself in some way with the unlawful act, and that he wilfully [sic] and knowingly seek by some act to help make the unlawful act succeed.").  The Third Circuit disagreed with *Tyson*'s analysis, noting that a later New Jersey Supreme Court decision had refused to apply a *criminal* standard of shared intent to a *civil* claim for aiding and abetting liability.  *See Failla*, 146 F.3d at 157–59 (explaining that "in *Tyson*, the court found that the defendant's supervisory status satisfied the element of shared intent that it thought necessary for aiding and abetting liability," but concluding that "the issue of shared intent is irrelevant under the LAD" and the proper standard is that outlined in § 876(b) of the Restatement); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999) ("[W]e have rejected a requirement that an individual and an employer share the same discriminatory intent in order to find aiding and abetting liability . . . .").

42.    We find that Pennsylvania courts would similarly apply the standard for aiding and abetting outlined in the Restatement § 876(b).

43.    In reaching this conclusion, we acknowledge that in *Dici*—a Third Circuit opinion

issued before *Failla*—the court referenced *Tyson*'s criminal standard in the context of an aiding and abetting claim under the PHRA.  *See* 91 F.3d at 553 (finding that a supervisor is guilty of aiding and abetting the employer when the supervisor knew about the alleged harassment and failed to take prompt remedial action because in those circumstances, the supervisor and the employer "'share the intent to create a discriminatory atmosphere'" (quoting *Tyson*, 918 F. Supp. at 841)).[15]

44.     Nevertheless, we find that the same reasoning that animated the Third Circuit's decision in *Failla* applies in the context of the PHRA.  *See Savage v. Temple Univ. — of Commonwealth Sys. of Higher Educ.*, Civil Action No. 19-6026-KSM, 2022 WL 911153, at *11 (E.D. Pa. Mar. 29, 2022) (applying § 876(b)'s "substantial assistance or encouragement" standard to an aiding and abetting claim under the PHRA); *McCowan v. City of Philadelphia*, Civil Action No. 19-3326-KSM, 2022 WL 742687, at *35 (E.D. Pa. Mar. 10, 2022) (explaining that a plaintiff "must show the defendant knew about and either substantially assisted or encouraged the discrimination that the plaintiff experienced").

45.     First, the aiding and abetting provisions in the PHRA and NJLAD use nearly identical language, suggesting that the two statutes may be interpreted coextensively.  Indeed, the *Dici* court relied on *Tyson* because the language of the two statutes was "nearly identical."  *Dici*, 91 F.3d at 553.  And other courts interpreting similar provisions in other antidiscrimination

---

[15] Frequently, federal district courts applying Pennsylvania law have relied on *Dici* and *Tyson* when stating the standard for aiding and abetting liability under the PHRA.  *See, e.g.*, *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." (citing *Dici*, 91 F.3d at 552–53 and *Tyson*, 918 F. Supp. at 841)); *D'Altilio v. Dover Township*, Civil Action No. 1:06-CV-1931, 2009 WL 2948524, at *12 (M.D. Pa. Sept. 14, 2009) ("Case law from the Third Circuit explains that an individual can be liable under § 955(e) . . . for 'refusing to take prompt remedial action against any discrimination suffered by' an employee." (quoting *Dici*, 91 F.3d at 552–53)).

statutes have rejected *Tyson*'s reasoning and followed *Failla* instead. *See Matthews v. Eichorn Motors, Inc.*, 800 N.W.2d 823, 830 (Minn. Ct. App. 2011) (discussing *Tyson*, *Failla*, and *Dici* and holding that "[t]o the extent that the criminal and civil standards differ" under Minnesota law, "the legal standard established in the Restatement (Second) of Torts should govern aiding-and-abetting claims under the [Minnesota Human Rights Act]"); *see also, e.g.*, *Larry v. Marion Cnty Coal Co.*, 302 F. Supp. 3d 763, 777 (N.D. W.V. 2018) ("Based on the consistent application by other courts of the Restatement (Second) § 876(b) to aiding-and-abetting claims under similar statutes, as well as West Virginia's own application of the standard in other civil causes of action, this Court is persuaded that West Virginia would apply § 876(b) of the Restatement (Second) of Torts when a construing a claim for aiding and abetting under the [Human Rights Act]."); *Lovell v. United Airlines, Inc.*, No. CIV. 09-00146 ACK-LE, 2009 WL 3172729, at *3–4 (D. Hi. 2009) (finding that § 876(b) governs whether "a person aids and abets an unlawful discriminatory practice" under Hawaii law); *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1077–78 (Alaska 2005) (applying § 876(b) to "aiding and abetting discrimination claim" against the union under Alaska statute).

46.     Second, since *Dici* was decided, courts in Pennsylvania, like those in New Jersey, have repeatedly relied on § 876 in civil claims for aiding and abetting. *See Linde v. Linde*, 220 A.3d 1119, 1145 (Pa. Super. Ct. 2019) (applying § 876 to claim against company directors for aiding and abetting majority shareholder's breach of his fiduciary duty to a minority shareholder); *HRANEC Sheet Metal, Inc. v. Matlico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. Ct. 2014) (holding that "a concerted tortious conduct claim [under § 876] is a viable cause of action in Pennsylvania"); *Sovereign Bank v. Valentino*, 914 A.2d 415, 427 (Pa. Super. Ct. 2006) ("Based upon the foregoing, we hold that concerted tortious action, as defined in Section

876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law.").

47.     Considering this authority and the Third Circuit's precedential opinion in *Failla*, we find that to make out a PHRA claim for aiding and abetting against an individual employee, the plaintiff must show that the defendant knew about and substantially assisted or encouraged the discrimination that the plaintiff experienced.  *See Failla*, 146 F.3d at 157–58 ("[A]n employee aids and abets a violation of the LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer."); *Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 162–63 (3d Cir. 1973) (explaining that § 876(b) outlines three elements "required for liability:  (1) that an independent wrong exists; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong").

48.     To determine whether a defendant provided substantial encouragement or assistance, the Court considers "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind."  Restatement (Second) of Torts § 876(b), cmt on clause (b); *see also Jackson v. T&N Van Serv.*, 117 F. Supp. 2d 457, 465 (E.D. Pa. 2000) (analyzing five Restatement factors along with the "duration of the assistance provided" to determine whether the plaintiff's union provided substantial assistance or encouragement to the creation of the employer's alleged racially hostile work environment).

49.     Inaction in the face of known discrimination will rarely amount to substantial encouragement or assistance.  *Failla*, 146 F.3d at 158 ("As set forth above, we have concluded that aiding and abetting requires that one know the other's conduct constitutes a breach of duty and give substantial assistance or encouragement to that conduct.  The court's instruction,

38

requiring only knowledge of Failla's circumstances of having a handicap and being in need of an accommodation, combined with inaction, falls short of this standard.").

50.     After hearing the evidence and judging the credibility of all the witnesses, the Court finds that Union knew about and substantially assisted SEPTA's failure to accommodate Lett and the resulting constructive discharge.  It is clear that multiple SMART officials knew that Lett needed an accommodation to attend dialysis and that SEPTA had refused to help him.  Lett spoke with Harris, the Union's General Chairman and President, about his needs and Hopkins's response.  Indeed, he shared Hopkins's letter with Harris in August of 2018.  Lett similarly told Vice General Chairman Fulmore about his situation, along with Representative Stinsman.

51.     The Union does not meaningfully contest that it was unaware of Lett's situation, but instead, argues that SMART officials repeatedly told Lett that there was nothing that the Union could do about his shift.[16]  But Union officials did not merely step away from the situation; they actively inserted themselves into the process.  Harris shared Hopkins's letter with Schirg and spoke with him about Lett's situation.  Likewise, Stinsman told Lett that the Union was aware of his situation and going to schedule a meeting with SEPTA.  In addition, Harris and another Union official sat on the picking committee with Schirg in September 2018.  Despite knowing about Lett's disability and scheduling needs, and the availability of a run that worked with those needs, Harris did not attempt to contact Lett when his picks were no longer available and instead placed Lett on the bus list, selecting a run that was completely incompatible with

---

[16] SMART also spends much time arguing that the Union lacked any intent to aid SEPTA in its discrimination of Lett.  (Doc. No. 125 at pp. 29–31.)  But as discussed above, the issue is not SMART's intent, but whether it provided substantial assistance.  *Cf. Failla*, 146 F.3d at 156–57 (holding that "shared intent is irrelevant" to an aiding and abetting claim under New Jersey's LAD); *Jackson v. T&N Van Serv.*, No. CIV. A. 99-1267, 2000 WL 792888, at *6 (E.D. Pa. June 20, 2000) ("Here, Local 676, in restricting its argument to lack of intent to discriminate, has neglected to address Plaintiff's allegations of aiding and abetting under the NJLAD.").

Lett's dialysis treatments.[17]

52.     Harris testified that it was Lett's responsibility to provide a pick slip with an available run, and that the Union cannot be liable for picking the bus list because that position was selected per the Union's longstanding policy of selecting the run that the employee had one year prior.  (*See* Doc. No. 117 at 153:8–15 (referring to SMART's "unwritten rule" of assigning members who miss their pick to the shift they held a year earlier).) This argument is undermined, however, by Harris's additional testimony that he would sometimes call Union members during the picking to ask them which runs they wanted.  (*Id.* at 150:16–18 ("I mean, we've actually went [sic] to the control center to call the guys to say, yo, you're about to miss your pick, and they'll pull the bus over and make the call.  SEPTA allows it.").)  Not only does this testimony call into question whether the policy is as settled as the Union would have us believe, it also raises the additional question of why Harris declined to call Lett in this case.[18]

53.     In short, the Union did not merely decline to act on the knowledge that SEPTA

---

[17] Because Lett was constructively discharged in October 2018, we focus on the Union's actions up to that point and do not consider the February 2019 conversation between Lett and Harris.

[18] This and other inconsistencies in Harris's testimony make the Court question his credibility.  (*Compare* Doc. No. 117 at 177:21–25 (Harris testifying that the Union does not "get involved at all" when someone asks for a reasonable accommodation because the decision is "all up to SEPTA"), *with* Doc. No. 118 at 27:12–14 (Harris testifying that the Union typically uses the grievance process, which includes an informal meeting with SEPTA, to address discipline issues, but "[v]ery seldomly we get called in if they want to give an employee an accommodation"); *compare* Doc. No. 117 at 172:14–16 (Harris testifying that he "did not know [Lett] had an illness until we got into this.  Until this case came about, I did not know he had an illness"), *with id.* at 173:6–13 (Harris confirming that he knew Lett suffered from end-stage kidney disease when Lett showed him Hopkins's letter).  In particular, the Court finds uncredible Harris's testimony that the Union could not meet with SEPTA to discuss Lett's accommodation concerns, even though SMART represents its members in informal meetings with SEPTA on most other matters, (*see* Doc. No. 118 at 26:13–27:17 (testifying that when there is a discipline issue between a Union member and SEPTA, SMART has "an informal position that we sit down and just talk and try to resolve the issue"); *id.* at 28:17–24 (explaining that when the Union negotiates the collective bargaining agreement with SEPTA, Union officials "come together with the company.  We sit down")), and Harris testified that the Union has "seldomly" met with SEPTA to discuss accommodation issues in the past (*see* Doc. No. 118 at 27:12–14).

was refusing to accommodate Lett, but actively inserted itself into the situation to Lett's detriment.[19] *Cf. Alch v. Superior Court*, 19 Cal. Rptr. 3d 29, 68 (Cal. Ct. App. 2004) ("[T]he complaints clearly allege the [talent] agencies knew the employers were engaged in systemic discrimination on the basis of age, and gave 'substantial assistance or encouragement' to the employers by virtue of their own referral practices, screening out older writers in favor of younger ones."). *Contra Jackson*, 117 F. Supp. 2d at 467 ("[T]he only claims made by Plaintiff against any union members acting on behalf of the union involve Local 676's investigation of the noose incident [reported by the plaintiff] and of the earlier complaints of racial harassment made by former T&N employee Dan Gainey.  As already stated above, such allegations cannot rise to the level of assistance required to be deemed 'aiding and abetting.'"); *Ellison*, 118 P.3d at 1077–78 (finding that the "union was not liable for aiding and abetting discrimination" where the evidence showed only that "the stewards had knowledge of discriminatory actions and did not report them").

*   *   *

In sum, Lett has shown by a preponderance of the evidence that the Union aided and abetted SEPTA's failure to accommodate Lett and his resulting constructive discharge.

---

[19] For these reasons, the Court concludes that that even if we were to apply the "intent" standard described in *Dici*, we would still find SMART aided and abetted SEPTA's discriminatory conduct because the Union's highest officials took an active role in Lett's case and promised to assist him despite having no intention of doing so and, at times, actively worked with SEPTA's officials to keep him from receiving an accommodation.  *See Tyson*, 918 F. Supp. at 841 ("[I]n order to aid or abet another to commit an unlawful act, it is necessary that the defendant wilfully [sic] and knowingly associate himself in some way with the unlawful act, and that he wilfully [sic] and knowingly seek by some act to help make the unlawful act succeed.  The aider and abettor must share the same intent as the one who actually committed the offense.  There must be a community of purpose between the actual perpetrator and the aider and abettor." (quotation marks omitted)); *cf. Dici*, 91 F.3d at 553 ("[I]n paragraph 14 of the complaint, Dici states, 'although Sergeant Monaco knew or should have known that the Plaintiff was being subject to harassment, he repeatedly refused to take prompt action to end harassment directed at Plaintiff.'  Such conduct, if proven, would constitute aiding and abetting." (cleaned up)).

### III.   *Damages*

54.     When the court finds that a defendant "has engaged in or is engaging in an unlawful discriminatory practice" under the PHRA, "the court shall . . . order affirmative action which may include, but is not limited to . . . granting of back pay, or any other legal or equitable relief as the court deems appropriate."  43 Pa. Stat. & Cons. Stat. § 962(c)(3).

55.     Back pay is "a form of equitable relief awarded at the discretion of the court." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006).

56.     "In addition, legal and equitable relief includes damages for humiliation and mental anguish . . . ."  *Clarke v. Whitney*, 975 F. Supp. 754, 758 (E.D. Pa. 1997).

57.     Here, Lett seeks back pay in the amount of $264,000 and compensatory damages for emotional distress and loss of life's pleasures at an amount to be determined by the Court. (Doc. No. 124 at p. 38.)  SMART argues that Lett is not entitled to back pay because after he left SEPTA, he removed himself from the workforce, and thus, failed to mitigate his damages.  (Doc. No. 125 at pp. 32–33.)  It makes no argument as to Lett's request for compensatory damages. (*See generally id.*)

### A.   <u>Back Pay</u>

58.     "Back pay is routinely awarded to successful PHRA claimants" and "includes benefits that would have been received incident to employment."  *Clarke*, 975 F. Supp. at 758 (citations omitted).

59.     "An award of back pay is calculated from the date of the unlawful termination to the date that judgment is entered in the plaintiff's favor."  *Newton v. Pa. State Police*, Civil Action No. 18-1639, 2022 WL 874306, at *8 (W.D. Pa. Mar. 24, 2022).

60.     Although allowing an award of back pay, the PHRA simultaneously "imposes on claimants a duty to mitigate damages," which "means that a back pay award is reduced by any

amounts the plaintiff actually earned or could have earned through the exercise or reasonable diligence." *Clarke*, 975 F. Supp. at 758 (quotation marks omitted).

61.     "While it is the duty of a discrimination claimant to mitigate her losses, it is the employer who has the burden of proving a failure to mitigate." *Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 10 (3d Cir. 2005).

62.     The employer can satisfy its burden by proving "either that other substantially equivalent positions were available to [the employee] and she failed to use reasonable diligence in attempting to secure those positions, or, alternatively, that [the employee] withdrew entirely from the employment market." *Id.* at 10–11 (citations omitted).

63.     "When an employer successfully proves a failure to mitigate, any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate . . . ." *Id.* at 11.

64.     An employee's withdrawal from the employment market is considered a "willful loss of earnings," and it occurs when the employee "has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause." *Holocheck v. Luzerne Cnty. Head Start, Inc.*, No. 3:CV-04-2082, 2007 WL 954308, at *15 (M.D. Pa. Mar. 28, 2007).

65.     SMART argues that Lett withdrew from the workforce because he did not apply to any positions until the EEOC finished its investigation in April 2019—18 months after he was constructively discharged.  (Doc. No. 125 at p. 32.)

66.     We agree that Lett essentially withdrew from the employment market between October 2, 2017 and April 16, 2019, and therefore, this period will be excluded from the calculation of any back pay award.  *See Herman v. City of Allentown*, 985 F. Supp. 569, 580

(E.D. Pa. 1997) ("Plaintiff admits that he did not try to seek work and mitigate damages until the beginning of June, 1995.  Thus, Plaintiff is not entitled to back pay from the time the Defendant refused to rehire him in February, 1995 through the end of May 1995.  We find, however, that the Plaintiff attempted to mitigate damages since June of 1995, when his criminal record was expunged. . . .  Thus, Plaintiff is entitled to back pay from June of 1995 until the present."); *cf. Holocheck*, 2007 WL 954308, at *17 ("Ms. Holocheck's deposition testimony establishes that she voluntarily quit the labor market when she was fired.  By not taking any steps to obtain any gainful employment, she failed to mitigate her losses.").

67.     We do not, however, preclude all back pay merely because Lett failed to mitigate his losses during a portion of his unemployment.  *Cf. Booker v. Taylor Milk Co.*, 64 F.3d 860, 866 (3d Cir. 1995) ("The plain language of section 2000e–5 shows that amounts that could have been earned with reasonable diligence should be used to *reduce or decrease* a back pay award, not to wholly cut off the right to any back pay.  Furthermore, Defendant's 'no-mitigation-no back pay' argument is inconsistent with the 'make whole' purpose underlying Title VII." (emphasis added)).

68.     Notably, Lett applied for 12 positions between April of 2019 and the start of trial, and attended one interview, but never received a job offer.[20]  Given these efforts, we cannot find that Lett withdrew from the market after April of 2019.  *See Caufield*, 133 F. App'x at 12 ("[T]here is insufficient evidence in the record to conclude that Appellant removed herself from the job market entirely.  It is undisputed that she continued to remain on the substitute teacher list

---

[20] SMART tries to discredit Lett's efforts by noting that Lett failed to attend an interview with Frito Lay because of car troubles.  (Doc. No. 125 at p. 32.)  We do not, however, find this failure dispositive of Lett's attempts to find a new position.  For one, there is a reasonable explanation for why Lett was unable to attend his interview with Frito Lay, and more importantly, the remaining evidence shows that he applied to numerous other positions during this period and attended one other interview.

at Center Area, that she taught full time at a parochial school for four months, and that she

continued to apply for permanent elementary openings at Center Area as they became available.

Although a discrimination claimant's efforts need not be successful, she must exercise good faith

in attempting to secure a position.").

69.     SMART nevertheless argues that Lett's search was not diligent, asserting that Lett

"only applied for approximately a dozen jobs from April of 2019 to June of 2020, an average of

less than one per month."  (Doc. No. 125 at p. 32.)  It's noteworthy that during the end of this

period, the world was coping with mass shut-downs and an overwhelming number of lay-offs as

a result of the COVID-19 pandemic.  More importantly, however, SMART has not identified any

other substantially equivalent positions that were available to Lett after April 2019.  *See Clarke*,

975 F. Supp. at 759 ("Tri-Star argues first that Plaintiff's efforts to secure employment in the

three months immediately following his discharge were not reasonably diligent.  Tri-Star has

failed, however, to present any evidence of substantially equivalent employment available during

this time, thus it has failed to satisfy its burden in this regard.").  In other words, SMART has not

carried its burden of demonstrating that Lett's search after April 2019 was carried out in bad

faith.

70.     When Lett left SEPTA, he was earning approximately $20.42 per hour, working

60 hours per week.  (Doc. No. 117 at 19:15–18, 69:15–70:16; *see also* Ex. 48.)

71.     There were 149 weeks and 6 days between April 17, 2019[21] and March 1, 2022,

---

[21] We set the start date as April 17, 2019 because the evidence showed that Lett began looking for
a new job after the EEOC finished its investigation on that date.  *See Mason v. Assoc. for Independent
Growth*, 817 F. Supp. 550, 555 (E.D. Pa. 1993) ("The risk of lack of certainty with respect to projections
of lost income must be borne by the wrongdoer, not the victim; therefore, any ambiguity in what the
claimant would have received but for discrimination should be resolved against the discriminating
employee." (quotation marks and citations omitted)).

the first day of trial, so Lett's total earnings during this time would have been $183,604.97.[22]

### B. <u>Compensatory Damages</u>

72.     In addition to back pay, Lett also seeks compensatory damages for emotional distress and the loss of life's pleasures at an amount to be determined by the Court. (Doc. No. 124 at p. 38.)

73.     At trial, Lett and his wife testified with sincerity about the emotional distress caused by the disability discrimination he experienced at the hands of SEPTA and SMART.

74.     When asked how he feels about his inability to earn income, Lett testified:

> I always tried to avoid how that made me feel, but it was a big burden on me.  I have a young family, and I was the breadwinner of the family.  My wife didn't work in ten years.  So she had—you know, my whole circumstance changed.  Basically, our roles had to reverse.  But it made me feel almost less than a man because I'm used to earning money.

(Doc. No. 117 at 71:4–10.)

75.     His wife, Denean Lett, likewise testified that the Union's actions had a "tremendous" effect on her husband:

> Coming from a wife, seeing how strong my husband was, not only on the home front, but to see him totally diminished, he felt like every door he went to was completely closed.  Every time he tried to approach, they shut him down.
>
> I remember times he would come home so low.  It took so much from me just to lift him up to let him know that he was going to make it. . . .  And when he would come home and as I was making his plate for dinner, he was totally depressed.  I never seen my husband like that ever in my life.  From the 14 years up until now, I never seen this.
>
> What he's going through now was tremendous, not only on himself, but myself.  The depression, the anxiety, sometimes having to make him eat.  He felt like the union totally disregarded him.  They did

---

[22] Although Lett testified that he lost salary and benefits when he was constructively discharged, he has not put forth any evidence about the value of those benefits.

> not want to help him at all.  And that's what he told me and that's
> how I saw him with the depression, the anxiety.  I can't even begin
> to put in words what he went through.

(*Id.* at 132:5–133:3.)

76.     Lett also put forth evidence that he began seeing a therapist for depression in

February 2018 and that he continued to see a therapist at the time of trial.  (*Id.* at 71:11–75:15.)

This evidence suggests Lett not only experienced emotional distress as a result of SMART's

conduct, but that his mental anguish has been pervasive and long lasting.

77.     Acknowledging that "damages for emotional distress are difficult to quantify," we

believe $100,000 is sufficient compensation for Lett's injuries.  *See Borrell v. Bloomsburg Univ.*,

207 F. Supp. 3d 454, 486 (M.D. Pa. 2016) (finding an "award of $250,000.00" for emotional

damages was "appropriate" where the plaintiff "presented evidence that she suffered lasting

changes to her personality and her ability to trust others" and that "she continues to have sadness

and feels hurt by the demonstrated lack of consideration for her" but "did not present evidence

that she suffered any physical or emotional conditions requiring medical intervention or that she

was held in less esteem by her peers"); *see also Gagliardo v. Connaught Labs., Inc.*, 311 F.3d

565, 573–74 (3d Cir. 2002) (affirming district court's order upholding jury award for emotional

damages totaling $1.55 million where the plaintiff produced evidence tying her pain and

suffering to her employment problems after being diagnosed with MS and detailing the

worsening effect these problems had on her life, including her transformation "from a happy and

confident person to one who was withdrawn and indecisive"); *Bolden v. Se. Pa. Transp. Auth.*,

21 F.3d 29, 33 (3d Cir. 1994) (finding evidence supported jury verdict of $250,001 for emotional

distress where the plaintiff "produced virtually no evidence of a lessened reputation," of

"physical effects of distress" or "of having received counseling" but "presented testimony of four

persons in addition to himself" that catalogued the emotional distress he suffered, along with

evidence of lost income); *Johnston v. Sch. Dist. of Phila.*, Civil Action No. 04-4948, 2006 WL 999966, at *6–14 (E.D. Pa. Apr. 12, 2006) (declining to reduce $500,000 award for emotional distress to each plaintiff caused by employer's race discrimination).[23]   *Contra Dee v. Borough of Dunmore*, Civil Action No. 05-CV-1342, 2010 WL 1626908, at *8 (M.D. Pa. Apr. 21, 2010) (finding that "an award of $50,000 is the highest possible recovery that would no longer be shocking to the judicial conscience" where the plaintiff "suffered emotional distress," "feared damage to his reputation," and "had a history of high blood pressure which became elevated during the time period immediately following the violation," but he "suffered no loss of benefits, seniority, or pay" and presented "no evidence" that he "suffered any loss of reputation among his peers"); *Glass v. Snellbaker*, Civil Action No. 05-1971 (JBS), 2008 WL 4371760, at *20 (D.N.J. Sept. 17, 2008) (reducing the "compensatory damage award for emotional distress to $50,000," where the plaintiff testified that he felt "humiliated and emotionally devastated but continued coming to work just as before and reported no changes in sleep or other emotional effects," "did not suffer financial stress at that time, as his salary and benefits continued as long as he remained on the job," "sought no counseling or other mental health treatment, and no family member or coworker testified about the impact that Defendants' conduct had on him").

## IV.     *Conclusion*

In sum, Lett has shown by a preponderance of the evidence that SEPTA discriminated against him on the basis of his disability when it failed to accommodate his disability and constructively discharged him in October 2017.  He has also demonstrated by a preponderance of the evidence that SMART aided and abetted SEPTA's discrimination.  Lett is entitled to

---

[23] We recognize that $100,000 is less compensation than the damages approved in the cited cases. However, we think a slightly lower amount is appropriate here, considering SMART is liable for aiding and abetting and not the primary discrimination violation.

$183,604.97 in back pay and to $100,000 in compensatory damages, for a total award of $283,604.97.

An appropriate order follows.