IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON LETT,<br><br>    Plaintiff,<br><br>    v.<br><br>INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, LOCAL 1594,<br><br>    Defendant. | CIVIL ACTION<br><br>NO. 19-3170-KSM |

MEMORANDUM

**MARSTON, J.**                                                                                                                                          February 22, 2023

      Plaintiff Aaron Lett brought disability discrimination claims against his former employer, Southeastern Pennsylvania Transportation Authority ("SEPTA"), and his former Union, Defendant International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division, Local 1594 ("SMART" or the "Union") under state and federal law. Before trial, Lett settled his claims against SEPTA and the company was dismissed as a Defendant pursuant to Local Rule 41.1(b). After that, only Lett's claim against SMART for aiding and abetting discrimination in violation of the Pennsylvania Human Relations Act ("PHRA") remained. After a bench trial, the Court concluded that the Union aided and abetted SEPTA's failure to accommodate Lett's disability (end stage renal disease requiring dialysis three times per week) and the resulting constructive discharge. (Doc. No. 126 at 41.) The Court granted in part Lett's request for back pay and compensatory damages for emotional distress, resulting in a total award of $283,604.97 against SMART. (*Id.* at 48–49.)

      SMART asks the Court to reconsider its damages award, arguing that the Court

committed clear errors of law when it (1) awarded back pay for the period between June 2020 and March 2022, and (2) failed to allocate liability and apportion the damages award between SEPTA and SMART. (*See generally* Doc. No. 131.) Lett opposes the motion. (*See generally* Doc. No. 132.) The Court addresses each alleged error in turn.[1]

## I.     LEGAL STANDARD

SMART brings its Motion to Alter or Amend Judgment pursuant to Federal Rule of Civil Procedure 59(e). (Doc. No. 131-1 at 1.) *See* Fed. R. Civ. P. 59(e) (referring to a "motion to alter or amend judgment"). "The purpose of a motion for reconsideration is to correct manifest errors of law or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). "Out of consideration for finality and judicial economy," courts grant motions for reconsideration "sparingly." *Hatcher v. SCM Grp. N. Am., Inc.*, 167 F. Supp. 3d 719, 728 (E.D. Pa. 2016) (citation omitted).

The Third Circuit has identified three bases for altering a judgment under Rule 59(e): "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice." *Allah v. Ricci*, 532 F. App'x 48, 51 (3d Cir. 2013) (quoting *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)); *see also Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). SMART relies on the third basis, arguing that the Court committed clear errors of law. A clear error of law exists if "after reviewing the evidence, [the court is] left with a definite and firm conviction that a mistake has been committed." *Norristown Area Sch. Dist. v. F.C.*, 636 F. App'x 857, 861 n.8 (3d Cir. 2016).

---

[1] The Court provided a complete recitation of its findings of fact in its prior Memorandum (*see* Doc. No. 126 at 2–17), and therefore, does not restate those findings here.

II.     BACK PAY

First, SMART challenges the Court's back pay award.  (Doc. No. 131-1 at 7–11.)  As the Court explained in its prior Memorandum (Doc. No. 126 at 42), when a defendant "has engaged in . . . an unlawful discriminatory practice" under the PHRA, "the court shall . . . order affirmative action which may include, but is not limited to . . . granting of back pay . . . ."  43 Pa. Stat. & Cons. Stat. § 962(c)(3); *see also Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006) (describing back pay as "a form of equitable relief awarded at the discretion of the court").

Although permitting an award of back pay, the PHRA simultaneously "imposes on claimants a duty to mitigate damages," which "means that a back pay award is reduced by any amounts the plaintiff actually earned or could have earned through the exercise of reasonable diligence."  *Clarke*, 975 F. Supp. at 758 (quotation marks omitted).  Although "it is the duty of a discrimination claimant to mitigate her losses, it is the employer who has the burden of proving a failure to mitigate."  *Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 10 (3d Cir. 2005).  The employer, or in this case, the Union, can satisfy its burden by proving "either that other substantially equivalent positions were available to [the employee] and [he] failed to use reasonable diligence in attempting to secure those positions, or, alternatively, that [the employee] withdrew entirely from the employment market."  *Id.* at 10–11 (citations omitted).  "A plaintiff exercises reasonable diligence by 'demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment.'"  *DiFlorio v. Kleckner*, Civil Action No. 11–4405, 2012 WL 748910, at *12 (E.D. Pa. Mar. 7, 2012) (quoting *Booker*, 64 F.3d at 864).  And an employee entirely withdraws from the employment market when he "fail[s] to stay in the labor market, refuse[s] to accept comparable employment, fail[s] to search diligently for other work, or voluntarily quit[s] alternative employment without

3

cause." *Holocheck v. Luzerne Cnty. Head Start, Inc.*, No. 3:CV-04-2082, 2007 WL 954308, at *15 (M.D. Pa. Mar. 28, 2007). Whether a plaintiff has "met his duty to mitigate damages is a factual determination." *DiFlorio*, 2012 WL 748910, at *12.

Here, the Court found that Lett withdrew from the employment market between October 2, 2017 (the day he was constructively discharged) and April 16, 2019, and therefore, excluded this period from the calculation of any back pay award. (Doc. No. 126 at 43–44.) The Court did not, however, "preclude all back pay merely because Lett failed to mitigate his losses during a portion of his unemployment." (*Id.* at 44.) Finding that Lett applied for 12 positions and attended one interview between April 2019 and the start of trial in March 2022, the Court awarded back pay for this period. (*Id.* at 44–45.) SMART argues that this ruling was partially in error because there is no evidence that Lett applied for any positions between June 2020 and the start of trial, and therefore, the Court should have found that Lett again withdrew from the job market during those months and excluded them from the back pay award. (*See* Doc. No. 131-1 at 7 ("[I]t was a clear error of law and fact to determine that the back pay period for Plaintiff extended until March 1, 2022, where he had not sought any alternate employment for 20 months.").)

The Court rejected this argument in its prior opinion, reasoning that Lett affirmatively reentered the employment market in April 2019 when he began applying for new positions. We explained that Lett showed that he applied for 12 positions between then and June 2020, at which point the COVID-19 Pandemic had markedly changed the employment landscape. (Doc. No. 126 at 45.) Given these facts, the Court found that SMART had not carried its burden of showing that Lett again withdrew from the employment market after June 2020, nor had it shown

that Lett failed to apply to substantially equivalent positions that were available after that date.[2] (*Id.*) *See DiFlorio*, 2012 WL 748910, at *12 ("District courts sitting in the Third Circuit have relied on *Tubari* and *Caufield* to acknowledge that an employer need not provide evidence that substantially equivalent work is available if its former employee has entirely withdrawn from the job market.").

SMART argues that this ruling amounts to legal error because "it is uncontroverted Plaintiff entirely withdrew from the employment market after June 2020 as that was the last time he attempted to seek employment." (Doc. No. 131-1 at 8.) The Court disagrees for multiple reasons. First, SMART's interpretation stretches the withdrawal doctrine too far. An employer proves failure to mitigate when it shows that the employee "had withdrawn *completely* from the employment market." *Caufield*, 133 F. App'x at 11; *id.* at 12 ("As we see it, the evidence proffered by Center Area does not demonstrate that, as a matter of law, . . . she left the job market altogether."); *see also Tubari Ltd., Inc. v. NLRB*, 959 F.2d 451, 459 (3d Cir. 1992) ("[A]lthough Tubari has not submitted proof that other work was available and it is normally the employer's burden to establish this element of mitigation, as we have indicated above this is irrelevant where, as here, the [employee] made *no search* for comparable interim employment." (emphasis added)); *Ngai v. Urban Outfitters, Inc.*, CIVIL ACTION NO. 19-1480, 2021 WL

---

[2] SMART argues that the Court erred in assigning the burden to it because "there is no support for the proposition that a burden exists on the part of Local 1594 to establish that Plaintiff engaged in bad faith where it is uncontroverted that Plaintiff ceased all attempts at finding work and withdrew from the workforce from June 2020 until March 2022." (Doc. No. 131-1 at 9 n.1.) But the Court did not so hold. Instead, the Court appropriately held that SMART had the burden of proving *either* that (1) "other substantially equivalent positions were available to [Lett] and [ ]he failed to use reasonable diligence in attempting to secure those positions," or (2) that [Lett] withdrew entirely from the employment market." *Caufield*, 133 F. App'x at 10–11; *see also Conway v. Hercules Inc.*, 831 F. Supp. 354, 359 (D. Del. 1993) ("The mitigation of damages is an affirmative defense. As such, the burden of proving plaintiff failed to mitigate his damages falls squarely on defendant."). In the Court's prior Memorandum, the Court found that SMART failed to satisfy this burden because it had not proven that Lett withdrew from the employment market after June 2020, nor had it put forth evidence of substantially equivalent positions. In this Memorandum, the Court holds that the first finding was not in error, and the second is not challenged.

1175155, at *20 (E.D. Pa. Mar. 29, 2021) ("The required showing is that plaintiff has withdrawn *entirely* from the employment market, which is more onerous than establishing a plaintiff's job search was not reasonably diligent."); *Holocheck*, 2007 WL 954308, at *16 ("Defendants have shown that Ms. Holocheck withdrew completely from the labor force. . . . Ms. Holocheck's deposition testimony establishes that she voluntarily quit the labor market when she was fired. By not taking *any steps* to obtain *any* gainful employment, she failed to mitigate her losses." (emphases added).)

Indeed, the Court found Lett entirely withdrew from the market before April 2019 because he testified that he did not begin looking for a new job or take any steps to find a new job until that date.[3] However, after April 2019, Lett reasserted himself into the market, applying for at least 12 equivalent positions in the greater Philadelphia area over the course of 14 months. (*See* Doc. No. 117 at 63:19–68:5.) Although the last application *identified in the record* was submitted in June 2020, there is, for example, no evidence that this was the last application Lett submitted, that he stopped looking for open positions in June 2020, that he began attending school instead of looking for a new job, or that he turned down offers for employment.[4] Accordingly, the Court cannot find that SMART has met its burden of showing that Lett again withdrew from the market as of June 2020. *See DiFlorio*, 2012 WL 748910, at *13 ("[W]e

---

[3] Although the Court does not revisit this determination, on a second review of the record, the Court finds it telling that Lett did not begin looking for a job during this period because he still believed he would be able to return to work at SEPTA after the EEOC finished its investigation. (*See* Doc. No. 117 at 63:19–23 ("Q: After you were terminated from SEPTA, what efforts did you undertake to find a job? A: Well, in the beginning, I didn't know that it would take—I didn't know that I would not be able to go back to work for SEPTA."). *Compare* Tr. Ex. 38 (Lett's application to New Jersey Transit for potential employment dated April 25, 2019), *with* Tr. Ex. 47 (EEOC's Notice of Right to Sue dated April 17, 2019).)

[4] Notably, at trial, it was Lett's counsel who introduced the job applications that he submitted between April 2019 and June 2020. (*See* Doc. No. 117 at 63:19–68:5.) SMART's counsel failed to ask Lett *any questions* about his mitigation efforts.

6

cannot conclude that [the plaintiff] entirely removed himself from the job market from 2011 to present," because even if he "didn't feel an immediate rush to run out and get" a new job, he testified that he "continued to send stuff here and there" and there was no evidence that he failed to "apply for an available position, withdrew his application, or declined a job offer" during this period.); *cf. Tubari Ltd., Inc.*, 959 F.2d at 459 ("[A]s we have indicated, any doubt is resolved against the employer who is, after all, the wrongful party in a backpay inquiry."); *Ngai*, 2021 WL 1175155, at *20 ("The required showing is that plaintiff has withdrawn *entirely* from the employment market, which is more onerous than establishing a plaintiff's job search was not reasonably diligent."). *Contra McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 464–65 (E.D. Pa. 2009) ("[The plaintiff] *conceded that he had stopped looking for employment* after he was discharged from Temple University in August 2005. [He] testified that, between August 2005 and his testimony at the May 2009 hearing, he had submitted no applications for employment to any employer. The Court finds that Carnation's complete failure to search for any employment in this period amounts to a complete withdrawal from the job market, justifying a cut off of back pay as of the end of August 2005." (emphasis added)); *Ellis v. Ethicon, Inc.*, Civil Action No. 05-726 (FLW), 2009 WL 10641983, at *16 (D.N.J. Nov. 13, 2009) (confirming the jury's conclusion that the plaintiff "failed to mitigate her damages by failing to find suitable employment after she left Aventis," where the plaintiff testified that she made no inquiries about returning to work at Aventis, made no attempts to search for other employment, submitted no letters or resumes, and engaged in no networking attempts during the intervening four and a half years).

And, as the Court noted in its prior Memorandum, this conclusion is reinforced by the timing of the COVID-19 Pandemic, which admittedly disrupted job markets throughout 2020

7

and 2021, especially for immunocompromised individuals like Lett, and by the fact that Lett, as part of his settlement agreement with SEPTA in February 2022, ultimately accepted a new position with the company and thus, demonstrated his continued interest in returning to the job market. (*See* Doc. No. 111.) *See Caufield*, 133 F. App'x at 11 ("The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market.").

For those reasons, the Court does not find that its prior holding amounts to a clear error of law. The back pay award stands.

### III.     APPORTIONMENT

Second, SMART argues that the Court committed a clear error of law when it tagged the Union with the full damages award instead of allocating liability between SMART and SEPTA according to the relative fault of each. (Doc. No. 131-1 at 7, 12–13.) Lett responds that SMART waived the issue by not raising it earlier and argues that even if the Court did consider SMART's argument, there is no basis in the record from which we could apportion damages. (Doc. No. 132 at 12.) The Court agrees.

First, the Court finds that SMART waived this argument because it failed to argue for apportionment at any time before its current brief. *See, e.g.*, *Amgen Inc. v. Amneal Pharma. LLC*, Civ. No. 16-853-MSG Consolidated, 2021 WL 6882653, at *2 (D. Del. Oct. 20, 2021) ("An argument raised on motion for reconsideration comes too late and is ordinarily deemed waived." (quotation marks omitted)). For this reason, apportionment is also not the proper subject of a motion for reconsideration. *See Sarpolis v. Tershko*, 625 F. App'x 594, 599 (3d Cir. 2016) (acknowledging "well-settled rule that reconsideration is improper when a party should have raised an argument earlier"); *Hayes v. Easterday*, Civil Action No. 11-0681, 2012 WL 13207472, at *1 (E.D. Pa. Feb. 7, 2012) ("A motion for reconsideration is not granted in order to

8

address arguments that a party could have but failed to raise earlier."); *Kraemer ex rel. Kraemer v. Pennsylvania*, Civil No. 10–4868 (WJM), 2011 WL 5075315, at *2 (E.D. Pa. Oct. 25, 2011) ("To show that the Court committed 'a clear error of law or fact' or that 'manifest injustice' has resulted, the moving party must base its motion on arguments that have been previously raised but overlooked by the Court." (quotation marks omitted)).

Second, and relatedly, the Court denies SMART's request for reconsideration on its merits because there is no basis in the record from which the Court could limit the Union's share of damages.  SMART acknowledges that when "multiple defendants are found liable for discrimination against a plaintiff or plaintiffs, joint and several liability is appropriate."  (Doc. No. 131-1 at 12.)  *See Taylor v. Cent. Pa. Drug & Alcohol Serv.*, 890 F. Supp. 360, 364 (M.D. Pa. 1995) (awarding the plaintiffs compensatory damages and back pay under the PHRA following a bench trial on damages and noting that "[l]iability is joint and several among all defendants"); *Lopez v. Citywide Cmty. Counseling Servs., Inc.*, No. 1843 EDA 2015, *et al.*, 2016 WL 5420685, at *11 (Pa. Super. Ct. Sept. 27, 2016) (confirming damages award against the plaintiff's supervisor and former employer under the PHRA and finding that "this Court properly imposed joint and several liability among" the two defendants).  When multiple defendants are jointly and severally liable, the plaintiff "is entitled to recover the full amount of damages against any one [of them]." *Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 389 (M.D. Pa. 2019); *see also Carrozza v. Greenbaum*, 916 A.2d 553, 557 & n.5 (Pa. 2007) ("As in any other joint and several judgment situation, the judgment creditor may seek satisfaction of its judgment from [any defendant] to the extent of the entire judgment . . . .").

Nevertheless, when one defendant settles and the other proceeds to trial on a claim for which they are jointly and severally liable, the Court may determine whether the non-settling

defendant is relieved of its responsibility to pay a portion of the damages award. This determination requires consideration of two issues—allocation of liability and the appropriate amount of set off, if any. *See Baker v. ACandS*, 755 A.2d 644, 671 (Pa. 2000) ("[T]he proper method in calculating set-off is first to apportion shares of liability. . . . The next step in the process is to determine which set-off method applies with regard to each individual settling tortfeasor.").

### A.     *Allocation of Liability*

SMART argues that the Court should "consider the fault of each party" in allocating liability and in doing so, require it to pay only a small portion of Lett's damages award. (Doc. No. 131-1 at 12.) Fault-based apportionment is appropriate only when liability is premised on a theory of negligence. *See Walton v. Avco Corp.*, 610 A.2d 454, 462 (Pa. 1992). ("In a case such as this, *where neither defendant was found liable under the theory of negligence, we believe it improper to introduce concepts of fault in the damage-apportionment process*."); *see also Advanced Fluid Sys., Inc.*, 381 F. Supp. 3d at 389 ("The Supreme Court of Pennsylvania has suggested, however, that comparative contribution principles have no application when liability is based on something other than negligence." (citing *Walton*, 610 A.2d at 462)).

In all other cases, liability is apportioned on a *pro rata* basis. *See Walton*, 610 A.2d at 462 ("Both the plaintiffs and Avco argue that the Superior Court erred in holding that the principles of comparative fault should be employed in apportioning liability for damages between two strictly liable defendants and claim instead that the apportionment should be made on a *pro rata* basis as held by the trial court. We agree and conclude that the Superior Court's introduction of 'comparative fault' in allocation of the damage award between strictly liable defendants was erroneous."); *see also Baker*, 755 A.2d at 672 ("[T]he trial court correctly determined that in this strict liability action, the verdict was to be apportioned equally among

[the non-settling defendant] and the four settling defendants.").

Neither party has argued about whether the discrimination Lett experienced was more akin to negligence, implying a fault-based allocation of liability should control, or more akin to strict liability, implying a *pro rata* allocation should control. And no Pennsylvania court has addressed this issue. Nevertheless, a strict reading of *Walton* suggests that a *pro rata* allocation is the more appropriate here because a fault-based analysis applies *only* when the relevant cause of action is for negligence. 610 A.2d at 462; *see also Nolan*, 542 F. Supp. 2d at 434 ("A PHRA claim is not a common law tort claim . . . ."); *cf. Wertz v. Chapman Twp.*, 741 A.2d 1272, 1278–79 (Pa. 1999) (rejecting the parties' argument that "sexual discrimination" under the PHRA "should be viewed as a tort akin to personal injury or as an action for wrongful discharge" for purposes of determining whether a jury trial was protected by the Pennsylvania constitution because "the PHRA provides for a statutory cause of action that was formerly unavailable" and thus, analogies to common law claims "must be viewed with circumspection"); *Raleigh v. Westinghouse Elec. Corp.*, 550 A.2d 1013, 1014 (Pa. Super. Ct. 1988) (describing the plaintiff's race discrimination claims as a cause of action that "charges intentional as well as tortious conduct" for purposes of determining the appropriate statute of limitations).

In the end, however, the issue of allocation is ultimately immaterial in this case because it would not change the joint and several nature of that liability. In other words, even if SMART was allocated 50% (or 10% or 80%) of the liability, Lett could still recover the *entire* damages award from the Union *unless* SMART showed that a set off was appropriate based on Lett's settlement with SEPTA before judgment was entered. *See Advanced Fluid Sys., Inc.*, 381 F. Supp. 3d at 389 ("The damages award in this case is appropriately borne by all defendants equally. Based on the court's determination that the defendants are jointly and severally liable,

11

[the plaintiff] is entitled to recover the full measure of damages against any one of them."); *cf. Wirth v. Miller*, 580 A.2d 1154, 1157 (Pa. Super. Ct. 1990) (rejecting the defendants' argument that "the obligations of a non-settling defendant, following settlement by a joint tortfeasor, are fixed by the proportionate share of causal fault attributed to the nonsettling tortfeasor by the jury").

### B. Set Off for SEPTA's Settlement

In Pennsylvania, the Uniform Contribution Among Tortfeasors Act (the "UCATA"), 42 Pa. Stat & Cons. Stat. § 8321, "governs the effect of a partial settlement on non-settling joint tortfeasors." *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, Civil Action No. 16-1343, 2017 WL 2840352, at *11 (E.D. Pa. June 30, 2017); *see Kemper Nat'l P&C Co. v. Smith*, 615 A.2d 372, 379 (Pa. Super Ct. 1992) ("Moreover, the rights of contribution and apportionment of liability among multiple defendants is a matter which is governed exclusively by statute in Pennsylvania."); *cf. Nolan v. Duffy Connors LLP*, 542 F. Supp. 2d 429, 434 (E.D. Pa. 2008) ("Since the PHRA creates a species of statutory tort liability, it does not seem a reach to hold that those liable under it are tort-feasors for purposes of Pennsylvania's contribution statute."). That statute provides:

> A release by the injured person of one joint tort-feasor . . . reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa. Stat. & Cons. Stat. § 8326. This provision "contemplates three separate set-off scenarios":

> First, if the settlement agreement is silent, the set-off mechanism defaults to a pro tanto set-off and the nonsettling defendant is entitled to have the verdict reduced by the amount of consideration paid by the settling tortfeasor. In the second scenario, where the settlement agreement specifically provides for a pro tanto set-off,

12

> the UCATA envisions that such a specific election will always control.
>
> The third scenario is where the settlement agreement specifies a form of set-off other than a pro tanto set-off. . . . In other words, the settling parties may opt for a set-off mechanism such as a pro rata set-off.  Application of such a pro rata set-off would allow the nonsettling tortfeasor to reduce the amount of money owed to the plaintiff in an amount equal to the settling defendant's apportioned share of the verdict.  For example, suppose that there are two joint tortfeasors and one settles prior to trial pursuant to a pro rata release.  It is subsequently determined that each joint tortfeasor is liable for 50% of a $100,000.00 verdict.  The nonsettling tortfeasor is entitled to have the $100,000.00 verdict, the entirety of which it is obligated to pay as a joint and severally liable tortfeasor, reduced by $50,000.00, or 50% of the verdict.

*Baker*, 755 A.2d at 668–69; *see also Amato v. Bell & Gossett*, 116 A.3d 607, 615 n.3 (Pa. Super. Ct. 2015) ("To the extent that Crane's appellate claim encompasses settlements reached with entities found by the jury to be joint tortfeasors, Crane is entitled to a *pro rata* setoff. . . . When the parties opt for a *pro rata* release, the amount of recovery against the non-settling joint tortfeasor is reduced by the settling tortfeasor's share of the verdict.  Here, the Plaintiffs signed *pro rata* releases with all settling parties.  Therefore, Crane is entitled to a reduction based on each settling joint tortfeasor's *pro rata*, and not *pro tanto*, share of the verdict.").

As this explanation shows, a set off can only be determined with reference to the settlement agreement between the plaintiff and the settling defendant.  *See Baker*, 755 A.2d at 668–69; *cf. Amato*, 116 A.3d at 617 ("[T]he company is only entitled to a reduction of the jury verdict based on settlements made by parties found to be joint tortfeasors by the court."). SMART failed to ask for, let alone produce, the settlement agreement between SEPTA and Lett or introduce any evidence as to its terms.[5]  Notably, SMART could have prevented SEPTA's

---

[5] Although Lett and SEPTA have agreed to produce a copy of the settlement agreement, which is confidential, that offer comes too late because SMART failed to make the agreement part of the official record.  It is not proper for SMART to demand a copy of that agreement now, during proceedings on a

dismissal, requiring that it stay in the case for the purpose of determining the effect, if any, of its settlement agreement with Lett. *See Slaughter v. Pa. X-Ray Corp.*, 638 F.2d 639, 643–44 (3d Cir. 1981) ("Pennsylvania cases hold that even though he has settled with the plaintiff and obtained a pro rata release, a defendant must nevertheless participate in the trial so that the jury may determine the issue of joint or sole liability."); *Stang v. Smith*, No. 09–3311, 2014 WL 11300415, at *4 (Pa. Ct. Comm. Pl. July 28, 2014) (explaining in negligence action that "the Non-Settling Defendants were entitled to have the Settling Defendants remain as parties to this action in order to establish their status as joint tortfeasors and, if found to be joint tortfeasors, to have the jury apportion or allocate liability among them in order that the amount of damages the Non-Settling Defendants might be liable to pay could be determined").

The facts of this case demonstrate precisely why it is so important for parties to raise arguments at the appropriate time and not wait to do so on a motion for reconsideration. By failing to address allocation and set off earlier, SMART waived those issues and left the record bare of any evidence of Lett's confidential settlement with SEPTA. Accordingly, the Court finds no error in its earlier holding that Lett may seek payment of the entire judgment from SMART.

## IV. CONCLUSION

The motion for reconsideration is denied. An appropriate order follows.

---

motion for reconsideration.